# EISENSTADT, SHERIFF v. BAIRD

No. 70–17.   Argued November 17–18, 1971—Decided March 22, 1972

BRENNAN, J., delivered the opinion of the Court, in which DOUGLAS, STEWART, and MARSHALL, JJ., joined. DOUGLAS, J., filed a concurring opinion, *post*, p. 455. WHITE, J., filed an opinion concurring in the result, in which BLACKMUN, J., joined, *post*, p. 460. BURGER, C. J., filed a dissenting opinion, *post*, p. 465. POWELL and REHNQUIST, JJ., took no part in the consideration or decision of the case.

*Joseph R. Nolan,* Special Assistant Attorney General of Massachusetts, argued the cause for appellant. With him on the brief were *Robert H. Quinn,* Attorney General, *John J. Irwin, Jr.,* and *Ruth I. Abrams,* Assistant Attorneys General, and *Garrett H. Byrne.*

*Joseph D. Tydings* argued the cause for appellee. With him on the briefs was *Joseph J. Balliro.*

Briefs of *amici curiae* urging affirmance were filed by *Harriet F. Pilpel* and *Nancy F. Wechsler* for the

Planned Parenthood Federation of America, Inc.; by *Roger P. Stokey* for the Planned Parenthood League of Massachusetts; by *Melvin L. Wulf* for the American Civil Liberties Union et al.; and by *Sylvia S. Ellison* for Human Rights for Women, Inc.

Mr. Justice Brennan delivered the opinion of the Court.

Appellee William Baird was convicted at a bench trial in the Massachusetts Superior Court under Massachusetts General Laws Ann., c. 272, § 21, first, for exhibiting contraceptive articles in the course of delivering a lecture on contraception to a group of students at Boston University and, second, for giving a young woman a package of Emko vaginal foam at the close of his address.[1] The Massachusetts Supreme Judicial Court unanimously set aside the conviction for exhibiting contraceptives on the ground that it violated Baird's First Amendment rights, but by a four-to-three vote sustained the conviction for giving away the foam. *Commonwealth* v. *Baird,* 355 Mass. 746, 247 N. E. 2d 574 (1969). Baird subsequently filed a petition for a federal writ of habeas corpus, which the District Court dismissed. 310 F. Supp. 951 (1970). On appeal, however, the Court of Appeals for the First Circuit vacated the dismissal and remanded the action with directions to grant the writ discharging Baird. 429 F. 2d 1398 (1970). This appeal by the Sheriff of Suffolk County, Massachusetts, followed, and we noted probable jurisdiction. 401 U. S. 934 (1971). We affirm.

Massachusetts General Laws Ann., c. 272, § 21, under which Baird was convicted, provides a maximum five-year term of imprisonment for "whoever . . . gives away . . . any drug, medicine, instrument or article whatever

---

[1] The Court of Appeals below described the recipient of the foam as "an unmarried adult woman." 429 F. 2d 1398, 1399 (1970). However, there is no evidence in the record about her marital status.

for the prevention of conception," except as authorized in § 21A.  Under § 21A, "[a] registered physician may administer to or prescribe for any married person drugs or articles intended for the prevention of pregnancy or conception.  [And a] registered pharmacist actually engaged in the business of pharmacy may furnish such drugs or articles to any married person presenting a prescription from a registered physician." [2]  As interpreted by the State Supreme Judicial

---

[2] Section 21 provides in full:

"Except as provided in section twenty-one A, whoever sells, lends, gives away, exhibits or offers to sell, lend or give away an instrument or other article intended to be used for self-abuse, or any drug, medicine, instrument or article whatever for the prevention of conception or for causing unlawful abortion, or advertises the same, or writes, prints, or causes to be written or printed a card, circular, book, pamphlet, advertisement or notice of any kind stating when, where, how, of whom or by what means such article can be purchased or obtained, or manufactures or makes any such article shall be punished by imprisonment in the state prison for not more than five years or in jail or the house of correction for not more than two and one half years or by a fine of not less than one hundred nor more than one thousand dollars."

Section 21A provides in full:

"A registered physician may administer to or prescribe for any married person drugs or articles intended for the prevention of pregnancy or conception.  A registered pharmacist actually engaged in the business of pharmacy may furnish such drugs or articles to any married person presenting a prescription from a registered physician.

"A public health agency, a registered nurse, or a maternity health clinic operated by or in an accredited hospital may furnish information to any married person as to where professional advice regarding such drugs or articles may be lawfully obtained.

"This section shall not be construed as affecting the provisions of sections twenty and twenty-one relative to prohibition of advertising of drugs or articles intended for the prevention of pregnancy or conception; nor shall this section be construed so as to permit the sale or dispensing of such drugs or articles by means of any vending machine or similar device."

Court, these provisions make it a felony for anyone, other than a registered physician or pharmacist acting in accordance with the terms of § 21A, to dispense any article with the intention that it be used for the prevention of conception. The statutory scheme distinguishes among three distinct classes of distributees—*first,* married persons may obtain contraceptives to prevent pregnancy, but only from doctors or druggists on prescription; *second,* single persons may not obtain contraceptives from anyone to prevent pregnancy; and, *third,* married or single persons may obtain contraceptives from anyone to prevent, not pregnancy, but the spread of disease. This construction of state law is, of course, binding on us. *E. g., Groppi* v. *Wisconsin,* 400 U. S. 505, 507 (1971).

The legislative purposes that the statute is meant to serve are not altogether clear. In *Commonwealth* v. *Baird, supra,* the Supreme Judicial Court noted only the State's interest in protecting the health of its citizens: "[T]he prohibition in § 21," the court declared, "is directly related to" the State's goal of "preventing the distribution of articles designed to prevent conception which may have undesirable, if not dangerous, physical consequences." 355 Mass., at 753, 247 N. E. 2d, at 578. In a subsequent decision, *Sturgis* v. *Attorney General,* 358 Mass. 37, ——, 260 N. E. 2d 687, 690 (1970), the court, however, found "a second and more compelling ground for upholding the statute"—namely, to protect morals through "regulating the private sexual lives of single persons." [3] The Court of Appeals, for reasons that will

---

[3] Appellant suggests that the purpose of the Massachusetts statute is to promote marital fidelity as well as to discourage premarital sex. Under § 21A, however, contraceptives may be made available to married persons without regard to whether they are living with their spouses or the uses to which the contraceptives are to be put. Plainly the legislation has no deterrent effect on extramarital sexual relations.

appear, did not consider the promotion of health or the protection of morals through the deterrence of fornication to be the legislative aim. Instead, the court concluded that the statutory goal was to limit contraception in and of itself—a purpose that the court held conflicted "with fundamental human rights" under *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), where this Court struck down Connecticut's prohibition against the use of contraceptives as an unconstitutional infringement of the right of marital privacy. 429 F. 2d, at 1401–1402.

We agree that the goals of deterring premarital sex and regulating the distribution of potentially harmful articles cannot reasonably be regarded as legislative aims of §§ 21 and 21A. And we hold that the statute, viewed as a prohibition on contraception *per se,* violates the rights of single persons under the Equal Protection Clause of the Fourteenth Amendment.

## I

We address at the outset appellant's contention that Baird does not have standing to assert the rights of unmarried persons denied access to contraceptives because he was neither an authorized distributor under § 21A nor a single person unable to obtain contraceptives. There can be no question, of course, that Baird has sufficient interest in challenging the statute's validity to satisfy the "case or controversy" requirement of Article III of the Constitution.[4] Appellant's argument, however, is that

---

[4] This factor decisively distinguishes *Tileston* v. *Ullman,* 318 U. S. 44 (1943), where the Court held that a physician lacked standing to bring an action for declaratory relief to challenge, on behalf of his patients, the Connecticut law prohibiting the use of contraceptives. The patients were fully able to bring their own action. Underlying the decision was the concern that "the standards of 'case or controversy' in Article III of the Constitution [not] become blurred," *Griswold* v. *Connecticut,* 381 U. S. 479, 481 (1965)— a problem that is not at all involved in this case.

this case is governed by the Court's self-imposed rules of restraint, *first,* that "one to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional," *United States* v. *Raines,* 362 U. S. 17, 21 (1960), and, *second,* the "closely related corollary that a litigant may only assert his own constitutional rights or immunities," *id.,* at 22. Here, appellant contends that Baird's conviction rests on the restriction in § 21A on permissible distributors and that that restriction serves a valid health interest independent of the limitation on authorized distributees. Appellant urges, therefore, that Baird's action in giving away the foam fell squarely within the conduct that the legislature meant and had power to prohibit and that Baird should not be allowed to attack the statute in its application to potential recipients. In any event, appellant concludes, since Baird was not himself a single person denied access to contraceptives, he should not be heard to assert their rights. We cannot agree.

The Court of Appeals held that the statute under which Baird was convicted is not a health measure. If that view is correct, we do not see how Baird may be prevented, because he was neither a doctor nor a druggist, from attacking the statute in its alleged discriminatory application to potential distributees. We think, too, that our self-imposed rule against the assertion of third-party rights must be relaxed in this case just as in *Griswold* v. *Connecticut, supra.* There the Executive Director of the Planned Parenthood League of Connecticut and a licensed physician who had prescribed contraceptives for married persons and been convicted as accessories to the crime of using contraceptives were held to have standing to raise the constitutional rights of the patients with whom they had a professional relationship.

Appellant here argues that the absence of a professional or aiding-and-abetting relationship distinguishes this case from *Griswold*. Yet, as the Court's discussion of prior authority in *Griswold*, 381 U. S., at 481, indicates, the doctor-patient and accessory-principal relationships are not the only circumstances in which one person has been found to have standing to assert the rights of another. Indeed, in *Barrows* v. *Jackson*, 346 U. S. 249 (1953), a seller of land was entitled to defend against an action for damages for breach of a racially restrictive covenant on the ground that enforcement of the covenant violated the equal protection rights of prospective non-Caucasian purchasers. The relationship there between the defendant and those whose rights he sought to assert was not simply the fortuitous connection between a vendor and potential vendees, but the relationship between one who acted to protect the rights of a minority and the minority itself. Sedler, Standing to Assert Constitutional Jus Tertii in the Supreme Court, 71 Yale L. J. 599, 631 (1962). And so here the relationship between Baird and those whose rights he seeks to assert is not simply that between a distributor and potential distributees, but that between an advocate of the rights of persons to obtain contraceptives and those desirous of doing so. The very point of Baird's giving away the vaginal foam was to challenge the Massachusetts statute that limited access to contraceptives.

In any event, more important than the nature of the relationship between the litigant and those whose rights he seeks to assert is the impact of the litigation on the third-party interests.[5] In *Griswold*, 381 U. S., at 481, the

---

[5] Indeed, in First Amendment cases we have relaxed our rules of standing without regard to the relationship between the litigant and those whose rights he seeks to assert precisely because application of those rules would have an intolerable, inhibitory effect on freedom of speech. *E. g., Thornhill* v. *Alabama*, 310 U. S. 88, 97–98 (1940). See *United States* v. *Raines*, 362 U. S. 17, 22 (1960).

Court stated: "The rights of husband and wife, pressed here, are likely to be diluted or adversely affected unless those rights are considered in a suit involving those who have this kind of confidential relation to them." A similar situation obtains here. Enforcement of the Massachusetts statute will materially impair the ability of single persons to obtain contraceptives. In fact, the case for according standing to assert third-party rights is stronger in this regard here than in *Griswold* because unmarried persons denied access to contraceptives in Massachusetts, unlike the users of contraceptives in Connecticut, are not themselves subject to prosecution and, to that extent, are denied a forum in which to assert their own rights. Cf. *NAACP* v. *Alabama,* 357 U. S. 449 (1958); *Barrows* v. *Jackson, supra.*[6] The Massachusetts statute, unlike the Connecticut law considered in *Griswold,* prohibits, not use, but distribution.

For the foregoing reasons we hold that Baird, who is now in a position, and plainly has an adequate incentive, to assert the rights of unmarried persons denied access to contraceptives, has standing to do so. We turn to the merits.

## II

The basic principles governing application of the Equal Protection Clause of the Fourteenth Amendment are familiar. As THE CHIEF JUSTICE only recently explained in *Reed* v. *Reed,* 404 U. S. 71, 75-76 (1971):

> "In applying that clause, this Court has consistently recognized that the Fourteenth Amendment

---

[6] See also *Prince* v. *Massachusetts,* 321 U. S. 158 (1944), where a custodian, in violation of state law, furnished a child with magazines to distribute on the streets. The Court there implicitly held that the custodian had standing to assert alleged freedom of religion and equal protection rights of the child that were threatened in the very litigation before the Court and that the child had no effective way of asserting herself.

does not deny to States the power to treat different classes of persons in different ways. *Barbier* v. *Connolly,* 113 U. S. 27 (1885); *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61 (1911); *Railway Express Agency* v. *New York,* 336 U. S. 106 (1949); *McDonald* v. *Board of Election Commissioners,* 394 U. S. 802 (1969). The Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co.* v. *Virginia,* 253 U. S. 412, 415 (1920)."

The question for our determination in this case is whether there is some ground of difference that rationally explains the different treatment accorded married and unmarried persons under Massachusetts General Laws Ann., c. 272, §§ 21 and 21A.[7] For the reasons that follow, we conclude that no such ground exists.

*First.* Section 21 stems from Mass. Stat. 1879, c. 159, § 1, which prohibited, without exception, distribution of articles intended to be used as contraceptives. In *Commonwealth* v. *Allison,* 227 Mass. 57, 62, 116 N. E. 265,

---

[7] Of course, if we were to conclude that the Massachusetts statute impinges upon fundamental freedoms under *Griswold,* the statutory classification would have to be not merely *rationally related* to a valid public purpose but *necessary* to the achievement of a *compelling* state interest. *E. g., Shapiro* v. *Thompson,* 394 U. S. 618 (1969); *Loving* v. *Virginia,* 388 U. S. 1 (1967). But just as in *Reed* v. *Reed,* 404 U. S. 71 (1971), we do not have to address the statute's validity under that test because the law fails to satisfy even the more lenient equal protection standard.

266 (1917), the Massachusetts Supreme Judicial Court explained that the law's "plain purpose is to protect purity, to preserve chastity, to encourage continence and self restraint, to defend the sanctity of the home, and thus to engender in the State and nation a virile and virtuous race of men and women." Although the State clearly abandoned that purpose with the enactment of § 21A, at least insofar as the illicit sexual activities of married persons are concerned, see n. 3, *supra,* the court reiterated in *Sturgis* v. *Attorney General, supra,* that the object of the legislation is to discourage premarital sexual intercourse. Conceding that the State could, consistently with the Equal Protection Clause, regard the problems of extramarital and premarital sexual relations as "[e]vils . . . of different dimensions and proportions, requiring different remedies," *Williamson* v. *Lee Optical Co.,* 348 U. S. 483, 489 (1955), we cannot agree that the deterrence of premarital sex may reasonably be regarded as the purpose of the Massachusetts law.

It would be plainly unreasonable to assume that Massachusetts has prescribed pregnancy and the birth of an unwanted child as punishment for fornication, which is a misdemeanor under Massachusetts General Laws Ann., c. 272, § 18. Aside from the scheme of values that assumption would attribute to the State, it is abundantly clear that the effect of the ban on distribution of contraceptives to unmarried persons has at best a marginal relation to the proffered objective. What Mr. Justice Goldberg said in *Griswold* v. *Connecticut, supra,* at 498 (concurring opinion), concerning the effect of Connecticut's prohibition on the use of contraceptives in discouraging extramarital sexual relations, is equally applicable here. "The rationality of this justification is dubious, particularly in light of the admitted widespread availability to all persons in the State of Connecticut, unmarried as well as married, of birth-control devices for the

prevention of disease, as distinguished from the prevention of conception." See also *id.*, at 505–507 (WHITE, J., concurring in judgment). Like Connecticut's laws, §§ 21 and 21A do not at all regulate the distribution of contraceptives when they are to be used to prevent, not pregnancy, but the spread of disease. *Commonwealth* v. *Corbett,* 307 Mass. 7, 29 N. E. 2d 151 (1940), cited with approval in *Commonwealth* v. *Baird,* 355 Mass., at 754, 247 N. E. 2d, at 579. Nor, in making contraceptives available to married persons without regard to their intended use, does Massachusetts attempt to deter married persons from engaging in illicit sexual relations with unmarried persons. Even on the assumption that the fear of pregnancy operates as a deterrent to fornication, the Massachusetts statute is thus so riddled with exceptions that deterrence of premarital sex cannot reasonably be regarded as its aim.

Moreover, §§ 21 and 21A on their face have a dubious relation to the State's criminal prohibition on fornication. As the Court of Appeals explained, "Fornication is a misdemeanor [in Massachusetts], entailing a thirty dollar fine, or three months in jail. Massachusetts General Laws Ann. c. 272 § 18. Violation of the present statute is a felony, punishable by five years in prison. We find it hard to believe that the legislature adopted a statute carrying a five-year penalty for its possible, obviously by no means fully effective, deterrence of the commission of a ninety-day misdemeanor." 429 F. 2d, at 1401. Even conceding the legislature a full measure of discretion in fashioning means to prevent fornication, and recognizing that the State may seek to deter prohibited conduct by punishing more severely those who facilitate than those who actually engage in its commission, we, like the Court of Appeals, cannot believe that in this instance Massachusetts has chosen to expose the aider and abetter who simply *gives away* a contraceptive to

*20* times the *90-day* sentence of the offender himself. The very terms of the State's criminal statutes, coupled with the *de minimis* effect of §§ 21 and 21A in deterring fornication, thus compel the conclusion that such deterrence cannot reasonably be taken as the purpose of the ban on distribution of contraceptives to unmarried persons.

*Second.* Section 21A was added to the Massachusetts General Laws by Stat. 1966, c. 265, § 1. The Supreme Judicial Court in *Commonwealth* v. *Baird, supra,* held that the purpose of the amendment was to serve the health needs of the community by regulating the distribution of potentially harmful articles. It is plain that Massachusetts had no such purpose in mind before the enactment of § 21A. As the Court of Appeals remarked, "Consistent with the fact that the statute was contained in a chapter dealing with 'Crimes Against Chastity, Morality, Decency and Good Order,' it was cast only in terms of morals. A physician was forbidden to prescribe contraceptives even when needed for the protection of health. Commonwealth v. Gardner, 1938, 300 Mass. 372, 15 N. E. 2d 222." 429 F. 2d, at 1401. Nor did the Court of Appeals "believe that the legislature [in enacting § 21A] suddenly reversed its field and developed an interest in health. Rather, it merely made what it thought to be the precise accommodation necessary to escape the *Griswold* ruling." *Ibid.*

Again, we must agree with the Court of Appeals. If health were the rationale of § 21A, the statute would be both discriminatory and overbroad. Dissenting in *Commonwealth* v. *Baird,* 355 Mass., at 758, 247 N. E. 2d, at 581, Justices Whittemore and Cutter stated that they saw "in § 21 and § 21A, read together, no public health purpose. If there is need to have a physician prescribe (and a pharmacist dispense) contraceptives, that need is as great for unmarried persons as for married persons."

The Court of Appeals added: "If the prohibition [on distribution to unmarried persons] . . . is to be taken to mean that the same physician who can prescribe for married patients does not have sufficient skill to protect the health of patients who lack a marriage certificate, or who may be currently divorced, it is illogical to the point of irrationality." 429 F. 2d, at 1401.[8] Furthermore, we must join the Court of Appeals in noting that not all contraceptives are potentially dangerous.[9] As a result, if the Massachusetts statute were a health measure, it would not only invidiously discriminate against the unmarried, but also be overbroad with respect to the married, a fact that the Supreme Judicial Court itself seems to have conceded in *Sturgis* v. *Attorney General*, 358 Mass., at ——, 260 N. E. 2d, at 690, where it noted that "it may well be that certain contraceptive medication and devices constitute no hazard to health, in which event it could be argued that the statute swept too broadly in its prohibition." "In·this posture," as the Court of

---

[8] Appellant insists that the unmarried have no right to engage in sexual intercourse and hence no health interest in contraception that needs to be served. The short answer to this contention is that the same devices the distribution of which the State purports to regulate when their asserted purpose is to forestall pregnancy are available without any controls whatsoever so long as their asserted purpose is to prevent the spread of disease. It is inconceivable that the need for health controls varies with the purpose for which the contraceptive is to be used when the physical act in all cases is one and the same.

[9] The Court of Appeals stated, 429 F. 2d, at 1401:

"[W]e must take notice that not all contraceptive devices risk 'undesirable . . . [or] dangerous physical consequences.' It is 200 years since Casanova recorded the ubiquitous article which, perhaps because of the birthplace of its inventor, he termed a 'redingote anglais.' The reputed nationality of the condom has now changed, but we have never heard criticism of it on the side of health. We cannot think that the legislature was unaware of it, or could have thought that it needed a medical prescription. We believe the same could be said of certain other products."

Appeals concluded, "it is impossible to think of the statute as intended as a health measure for the unmarried, and it is almost as difficult to think of it as so intended even as to the married." 429 F. 2d, at 1401.

But if further proof that the Massachusetts statute is not a health measure is necessary, the argument of Justice Spiegel, who also dissented in *Commonwealth* v. *Baird*, 355 Mass., at 759, 247 N. E. 2d, at 582, is conclusive: "It is at best a strained conception to say that the Legislature intended to prevent the distribution of articles 'which may have undesirable, if not dangerous, physical consequences.' If that was the Legislature's goal, § 21 is not required" in view of the federal and state laws *already* regulating the distribution of harmful drugs. See Federal Food, Drug, and Cosmetic Act, § 503, 52 Stat. 1051, as amended, 21 U. S. C. § 353; Mass. Gen. Laws Ann., c. 94, § 187A, as amended. We conclude, accordingly, that, despite the statute's superficial earmarks as a health measure, health, on the face of the statute, may no more reasonably be regarded as its purpose than the deterrence of premarital sexual relations.

*Third.* If the Massachusetts statute cannot be upheld as a deterrent to fornication or as a health measure, may it, nevertheless, be sustained simply as a prohibition on contraception? The Court of Appeals analysis "led inevitably to the conclusion that, so far as morals are concerned, it is contraceptives per se that are considered immoral—to the extent that *Griswold* will permit such a declaration." 429 F. 2d, at 1401–1402. The Court of Appeals went on to hold, *id.,* at 1402:

> "To say that contraceptives are immoral as such, and are to be forbidden to unmarried persons who will nevertheless persist in having intercourse, means that such persons must risk for themselves an unwanted pregnancy, for the child, illegitimacy, and

for society, a possible obligation of support. Such a view of morality is not only the very mirror image of sensible legislation; we consider that it conflicts with fundamental human rights. In the absence of demonstrated harm, we hold it is beyond the competency of the state."

We need not and do not, however, decide that important question in this case because, whatever the rights of the individual to access to contraceptives may be, the rights must be the same for the unmarried and the married alike.

If under *Griswold* the distribution of contraceptives to married persons cannot be prohibited, a ban on distribution to unmarried persons would be equally impermissible. It is true that in *Griswold* the right of privacy in question inhered in the marital relationship. Yet the marital couple is not an independent entity with a mind and heart of its own, but an association of two individuals each with a separate intellectual and emotional makeup. If the right of privacy means anything, it is the right of the *individual,* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. See *Stanley* v. *Georgia,* 394 U. S. 557 (1969).[10] See also *Skinner* v. *Okla-*

---

[10] In *Stanley,* 394 U. S., at 564, the Court stated:

"[A]lso fundamental is the right to be free, except in very limited circumstances, from unwanted governmental intrusions into one's privacy.

" 'The makers of our Constitution undertook to secure conditions favorable to the pursuit of happiness. They recognized the significance of man's spiritual nature, of his feelings and of his intellect. They knew that only a part of the pain, pleasure and satisfactions of life are to be found in material things. They sought to protect Americans in their beliefs, their thoughts, their emotions and their sensations. They conferred, as against the Government,

*homa*, 316 U. S. 535 (1942); *Jacobson* v. *Massachusetts*, 197 U. S. 11, 29 (1905).

On the other hand, if *Griswold* is no bar to a prohibition on the distribution of contraceptives, the State could not, consistently with the Equal Protection Clause, outlaw distribution to unmarried but not to married persons. In each case the evil, as perceived by the State, would be identical, and the underinclusion would be invidious. Mr. Justice Jackson, concurring in *Railway Express Agency* v. *New York*, 336 U. S. 106, 112–113 (1949), made the point:

> "The framers of the Constitution knew, and we should not forget today, that there is no more effective practical guaranty against arbitrary and unreasonable government than to require that the principles of law which officials would impose upon a minority must be imposed generally. Conversely, nothing opens the door to arbitrary action so effectively as to allow those officials to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected. Courts can take no better measure to assure that laws will be just than to require that laws be equal in operation."

Although Mr. Justice Jackson's comments had reference to administrative regulations, the principle he affirmed has equal application to the legislation here. We hold that by providing dissimilar treatment for married and unmarried persons who are similarly situated, Massa-

---

the right to be let alone—the most comprehensive of rights and the right most valued by civilized man.' *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting).

"See *Griswold* v. *Connecticut, supra;* cf. *NAACP* v. *Alabama*, 357 U. S. 449, 462 (1958)."

chusetts General Laws Ann., c. 272, §§ 21 and 21A, violate the Equal Protection Clause. The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE POWELL and MR. JUSTICE REHNQUIST took no part in the consideration or decision of this case.

MR. JUSTICE DOUGLAS, concurring.

While I join the opinion of the Court, there is for me a narrower ground for affirming the Court of Appeals. This to me is a simple First Amendment case, that amendment being applicable to the States by reason of the Fourteenth. *Stromberg* v. *California,* 283 U. S. 359.

Under no stretch of the law as presently stated could Massachusetts require a license for those who desire to lecture on planned parenthood, contraceptives, the rights of women, birth control, or any allied subject, or place a tax on that privilege. As to license taxes on First Amendment rights we said in *Murdock* v. *Pennsylvania,* 319 U. S. 105, 115:

> "A license tax certainly does not acquire constitutional validity because it classifies the privileges protected by the First Amendment along with the wares and merchandise of hucksters and peddlers and treats them all alike. Such equality in treatment does not save the ordinance. Freedom of press, freedom of speech, freedom of religion are in a preferred position."

We held in *Thomas* v. *Collins,* 323 U. S. 516, that a person speaking at a labor union rally could not be required to register or obtain a license:

> "As a matter of principle a requirement of registration in order to make a public speech would seem generally incompatible with an exercise of the rights

of free speech and free assembly. Lawful public assemblies, involving no element of grave and immediate danger to an interest the State is entitled to protect, are not instruments of harm which require previous identification of the speakers. And the right either of workmen or of unions under these conditions to assemble and discuss their own affairs is as fully protected by the Constitution as the right of businessmen, farmers, educators, political party members or others to assemble and discuss their affairs and to enlist the support of others.

. . . . .

". . . If one who solicits support for the cause of labor may be required to register as a condition to the exercise of his right to make a public speech, so may he who seeks to rally support for any social, business, religious or political cause. We think a requirement that one must register before he undertakes to make a public speech to enlist support for a lawful movement is quite incompatible with the requirements of the First Amendment." *Id.*, at 539, 540.

Baird addressed an audience of students and faculty at Boston University on the subject of birth control and overpopulation. His address was approximately one hour in length and consisted of a discussion of various contraceptive devices displayed by means of diagrams on two demonstration boards, as well as a display of contraceptive devices in their original packages. In addition, Baird spoke of the respective merits of various contraceptive devices; overpopulation in the world; crises throughout the world due to overpopulation; the large number of abortions performed on unwed mothers; and quack abortionists and the potential harm to women resulting from abortions performed by quack abortionists. Baird also urged members of the audience to petition the Massachusetts Legislature and to make known their feel-

ings with regard to birth control laws in order to bring about a change in the laws. At the close of the address Baird invited members of the audience to come to the stage and help themselves to the contraceptive articles. We do not know how many accepted Baird's invitation. We only know that Baird personally handed one woman a package of Emko Vaginal Foam. He was then arrested and indicted (1) for exhibiting contraceptive devices and (2) for giving one such device away. The conviction for the first offense was reversed, the Supreme Judicial Court of Massachusetts holding that the display of the articles was essential to a graphic representation of the lecture. But the conviction for the giving away of one article was sustained. 355 Mass. 746, 247 N. E. 2d 574. The case reaches us by federal habeas corpus.

Had Baird not "given away" a sample of one of the devices whose use he advocated, there could be no question about the protection afforded him by the First Amendment. A State may not "contract the spectrum of available knowledge." *Griswold* v. *Connecticut,* 381 U. S. 479, 482. See also *Thomas* v. *Collins, supra; Pierce* v. *Society of Sisters,* 268 U. S. 510; *Meyer* v. *Nebraska,* 262 U. S. 390. However noxious Baird's ideas might have been to the authorities, the freedom to learn about them, fully to comprehend their scope and portent, and to weigh them against the tenets of the "conventional wisdom," may not be abridged. *Terminiello* v. *Chicago,* 337 U. S. 1. Our system of government requires that we have faith in the ability of the individual to decide wisely, if only he is fully apprised of the merits of a controversy.

> "Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period." *Thornhill* v. *Alabama,* 310 U. S. 88, 102.

The teachings of Baird and those of Galileo might be

of a different order; but the suppression of either is equally repugnant.

As Milton said in the Areopagitica, "Give me the liberty to know, to utter, and to argue freely according to conscience, above all liberties."

It is said that only Baird's conduct is involved and *United States* v. *O'Brien,* 391 U. S. 367, is cited. That case involved a registrant under the Selective Service Act burning his Selective Service draft card. When prosecuted for that act, he defended his conduct as "symbolic speech." The Court held it was not.

Whatever may be thought of that decision on the merits,[1] *O'Brien* is not controlling here. The distinction between "speech" and "conduct" is a valid one, insofar as it helps to determine in a particular case whether the purpose of the activity was to aid in the communication of ideas, and whether the form of the communication so interferes with the rights of others that reasonable regulations may be imposed.[2] See *Public Utilities Comm'n* v. *Pollak,* 343 U. S. 451, 467 (DOUGLAS, J., dissenting).

---

[1] I have earlier expressed my reasons for believing that the *O'Brien* decision was not consistent with First Amendment rights. See *Brandenburg* v. *Ohio,* 395 U. S. 444, 455 (concurring opinion).

[2] In *Giboney* v. *Empire Storage Co.,* 336 U. S. 490, the Court upheld a state court injunction against peaceful picketing carried on in violation of a state "anti-restraint-of-trade" law. *Giboney,* however, is easily distinguished from the present case. Under the circumstances there present, "There was clear danger, imminent and immediate, that unless restrained, appellants would succeed in making [state antitrust] policy a dead letter . . . . They were exercising their economic power together with that of their allies to *compel* Empire to abide by union rather than by state regulation of trade." *Id.,* at 503 (footnote omitted; emphasis supplied). There is no such coercion in the instant case nor is there a similar frustration of state policy, see text at n. 4, *infra.* For an analysis of the state policies underlying the Massachusetts statute which Baird was convicted of having violated, see Dienes, The Progeny of Comstockery—Birth Control Laws Return to Court, 21 Am. U. L. Rev. 1, 3–44 (1971).

Thus, excessive noise might well be "conduct"—a form of pollution—which can be made subject to precise, narrowly drawn regulations. See *Adderley* v. *Florida,* 385 U. S. 39, 54 (DOUGLAS, J., dissenting). But "this Court has repeatedly stated, [First Amendment] rights are not confined to verbal expression. They embrace appropriate types of action . . . ." *Brown* v. *Louisiana,* 383 U. S. 131, 141–142.

Baird gave an hour's lecture on birth control and as an aid to understanding the ideas which he was propagating he handed out one sample of one of the devices whose use he was endorsing. A person giving a lecture on coyote-getters would certainly improve his teaching technique if he passed one out to the audience; and he would be protected in doing so unless of course the device was loaded and ready to explode, killing or injuring people. The same holds true in my mind for mousetraps, spray guns, or any other article not dangerous *per se* on which speakers give educational lectures.

It is irrelevant to the application of these principles that Baird went beyond the giving of information about birth control and advocated the use of contraceptive articles. The First Amendment protects the opportunity to persuade to action whether that action be unwise or immoral, or whether the speech incites to action. See, *e. g., Brandenburg* v. *Ohio,* 395 U. S. 444; *Edwards* v. *South Carolina,* 372 U. S. 229; *Terminiello* v. *Chicago, supra.*

In this case there was not even incitement to action.[3] There is no evidence or finding that Baird intended that the young lady take the foam home with her when he handed it to her or that she would not have examined the

---

[3] Even under the restrictive meaning which the Court has given the First Amendment, as applied to the States by the Fourteenth, advocacy of law violation is permissible "except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg* v. *Ohio, supra,* n. 1, at 447.

article and then returned it to Baird, had he not been placed under arrest immediately upon handing the article over.[4]

First Amendment rights are not limited to verbal expression.[5] The right to petition often involves the right to walk. The right of assembly may mean pushing or jostling. Picketing involves physical activity as well as a display of a sign. A sit-in can be a quiet, dignified protest that has First Amendment protection even though no speech is involved, as we held in *Brown* v. *Louisiana, supra.* Putting contraceptives on display is certainly an aid to speech and discussion. Handing an article under discussion to a member of the audience is a technique known to all teachers and is commonly used. A handout may be on such a scale as to smack of a vendor's marketing scheme. But passing one article to an audience is merely a projection of the visual aid and should be a permissible adjunct of free speech. Baird was not making a prescription nor purporting to give medical advice. Handing out the article was not even a suggestion that the lady use it. At most it suggested that she become familiar with the product line.

I do not see how we can have a Society of the Dialogue, which the First Amendment envisages, if time-honored teaching techniques are barred to those who give educational lectures.

MR. JUSTICE WHITE, with whom MR. JUSTICE BLACK-MUN joins, concurring in the result.

In *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), we reversed criminal convictions for advising married per-

---

[4] This factor alone would seem to distinguish *O'Brien, supra,* as that case turned on the Court's judgment that O'Brien's "conduct" frustrated a substantial governmental interest.

[5] For a partial collection of cases involving action that comes under First Amendment protection see *Brandenburg* v. *Ohio, supra,* n. 1, at 455–456 (concurring opinion).

sons with respect to the use of contraceptives. As there applied, the Connecticut law, which forbade using contraceptives or giving advice on the subject, unduly invaded a zone of marital privacy protected by the Bill of Rights. The Connecticut law did not regulate the manufacture or sale of such products and we expressly left open any question concerning the permissible scope of such legislation. 381 U. S., at 485.

Chapter 272, § 21, of the Massachusetts General Laws makes it a criminal offense to distribute, sell, or give away any drug, medicine, or article for the prevention of conception. Section 21A excepts from this prohibition registered physicians who prescribe for and administer such articles to married persons and registered pharmacists who dispense on medical prescription.[1]

---

[1] Section 21 provides as follows:

"Except as provided in section twenty-one A, whoever sells, lends, gives away, exhibits or offers to sell, lend or give away an instrument or other article intended to be used for self-abuse, or any drug, medicine, instrument or article whatever for the prevention of conception or for causing unlawful abortion, or advertises the same, or writes, prints, or causes to be written or printed a card, circular, book, pamphlet, advertisement or notice of any kind stating when, where, how, of whom or by what means such article can be purchased or obtained, or manufactures or makes any such article shall be punished by imprisonment in the state prison for not more than five years or in jail or the house of correction for not more than two and one half years or by a fine of not less than one hundred nor more than one thousand dollars."

Section 21A makes these exceptions:

"A registered physician may administer to or prescribe for any married person drugs or articles intended for the prevention of pregnancy or conception. A registered pharmacist actually engaged in the business of pharmacy may furnish such drugs or articles to any married person presenting a prescription from a registered physician.

"A public health agency, a registered nurse, or a maternity health clinic operated by or in an accredited hospital may furnish infor-

Appellee Baird was indicted for giving away Emko Vaginal Foam, a "medicine and article for the prevention of conception . . . ."[2] The State did not purport to charge or convict Baird for distributing to an unmarried person. No proof was offered as to the marital status of the recipient. The gravamen of the offense charged was that Baird had no license and therefore no authority to distribute to anyone. As the Supreme Judicial Court of Massachusetts noted, the constitutional validity of Baird's conviction rested upon his lack of status as a "distributor and not . . . the marital status of the recipient." *Commonwealth* v. *Baird,* 355 Mass. 746, 753, 247 N. E. 2d 574, 578 (1969). The Federal District Court was of the same view.[3]

---

mation to any married person as to where professional advice regarding such drugs or articles may be lawfully obtained.

"This section shall not be construed as affecting the provisions of sections twenty and twenty-one relative to prohibition of advertising of drugs or articles intended for the prevention of pregnancy or conception; nor shall this section be construed so as to permit the sale or dispensing of such drugs or articles by means of any vending machine or similar device."

[2] The indictment states:

"The Jurors for the Commonwealth of Massachusetts on their oath present that William R. Baird, on the sixth day of April, in the year of our Lord one thousand nine hundred and sixty-seven, did unlawfully give away a certain medicine and article for the prevention of conception, to wit: Emko Vaginal Foam, the giving away of the said medicine and article by the said William R. Baird not being in accordance with, or authorized or permitted by, the provisions of Section 21A of Chapter 272, of the General Laws of the said Commonwealth."

[3] "Had § 21A authorized registered physicians to administer or prescribe contraceptives for unmarried as well as for married persons, the legal position of the petitioner would not have been in any way altered. Not being a physician he would still have been prohibited by § 21 from 'giving away' the contraceptive." 310 F. Supp. 951, 954 (Mass. 1970).

I assume that a State's interest in the health of its citizens empowers it to restrict to medical channels the distribution of products whose use should be accompanied by medical advice. I also do not doubt that various contraceptive medicines and articles are properly available only on prescription, and I therefore have no difficulty with the Massachusetts court's characterization of the statute at issue here as expressing "a legitimate interest in preventing the distribution of articles designed to prevent conception which may have undesirable, if not dangerous, physical consequences." *Id.*, at 753, 247 N. E. 2d, at 578. Had Baird distributed a supply of the so-called "pill," I would sustain his conviction under this statute.[4] Requiring a prescription to obtain potentially dangerous contraceptive material may place a substantial burden upon the right recognized in *Griswold,* but that burden is justified by a strong state interest and does not, as did the statute at issue in *Griswold,* sweep unnecessarily broadly or seek "to achieve its goals by means having a maximum destructive impact upon" a protected relationship. *Griswold* v. *Connecticut,* 381 U. S., at 485.

Baird, however, was found guilty of giving away vaginal foam. Inquiry into the validity of this conviction does not come to an end merely because some contraceptives are harmful and their distribution may be restricted. Our general reluctance to question a State's judgment on matters of public health must give way where, as here, the restriction at issue burdens the con-

---

[4] The Food and Drug Administration has made a finding that birth control pills pose possible hazards to health. It therefore restricts distribution and receipt of such products in interstate commerce to properly labeled packages that must be sold pursuant to a prescription. 21 CFR § 130.45. A violation of this law is punishable by imprisonment for one year, a fine of not more than $10,000, or both. 21 U. S. C. §§ 331, 333.

stitutional rights of married persons to use contraceptives. In these circumstances we may not accept on faith the State's classification of a particular contraceptive as dangerous to health. Due regard for protecting constitutional rights requires that the record contain evidence that a restriction on distribution of vaginal foam is essential to achieve the statutory purpose, or the relevant facts concerning the product must be such as to fall within the range of judicial notice.

Neither requirement is met here. Nothing in the record even suggests that the distribution of vaginal foam should be accompanied by medical advice in order to protect the user's health. Nor does the opinion of the Massachusetts court or the State's brief filed here marshal facts demonstrating that the hazards of using vaginal foam are common knowledge or so incontrovertible that they may be noticed judicially. On the contrary, the State acknowledges that Emko is a product widely available without prescription. Given *Griswold* v. *Connecticut, supra,* and absent proof of the probable hazards of using vaginal foam, we could not sustain appellee's conviction had it been for selling or giving away foam to a married person. Just as in *Griswold,* where the right of married persons to use contraceptives was "diluted or adversely affected" by permitting a conviction for giving advice as to its exercise, *id.,* at 481, so here, to sanction a medical restriction upon distribution of a contraceptive not proved hazardous to health would impair the exercise of the constitutional right.

That Baird could not be convicted for distributing Emko to a married person disposes of this case. Assuming, *arguendo,* that the result would be otherwise had the recipient been unmarried, nothing has been placed in the record to indicate her marital status. The State has maintained that marital status is irrelevant because an unlicensed person cannot legally dispense vaginal foam

either to married or unmarried persons. This approach is plainly erroneous and requires the reversal of Baird's conviction; for on the facts of this case, it deprives us of knowing whether Baird was in fact convicted for making a constitutionally protected distribution of Emko to a married person.

The principle established in *Stromberg* v. *California,* 283 U. S. 359 (1931), and consistently adhered to is that a conviction cannot stand where the "record fail[s] to prove that the conviction was not founded upon a theory which could not constitutionally support a verdict." *Street* v. *New York,* 394 U. S. 576, 586 (1969). To uphold a conviction even "though we cannot know that it did not rest on the invalid constitutional ground . . . would be to countenance a procedure which would cause a serious impairment of constitutional rights." *Williams* v. *North Carolina,* 317 U. S. 287, 292 (1942).

Because this case can be disposed of on the basis of settled constitutional doctrine, I perceive no reason for reaching the novel constitutional question whether a State may restrict or forbid the distribution of contraceptives to the unmarried. Cf. *Ashwander* v. *Tennessee Valley Authority,* 297 U. S. 288, 345–348 (1936) (Brandeis, J., concurring).

MR. CHIEF JUSTICE BURGER, dissenting.

The judgment of the Supreme Judicial Court of Massachusetts in sustaining appellee's conviction for dispensing medicinal material without a license seems eminently correct to me and I would not disturb it. It is undisputed that appellee is not a physician or pharmacist and was prohibited under Massachusetts law from dispensing contraceptives to anyone, regardless of marital status. To my mind the validity of this restriction on dispensing medicinal substances is the only issue before the Court,

and appellee has no standing to challenge that part of the statute restricting the persons to whom contraceptives are available. There is no need to labor this point, however, for everyone seems to agree that if Massachusetts has validly required, as a health measure, that all contraceptives be dispensed by a physician or pursuant to a physician's prescription, then the statutory distinction based on marital status has no bearing on this case. *United States* v. *Raines,* 362 U. S. 17, 21 (1960).

The opinion of the Court today brushes aside appellee's status as an unlicensed layman by concluding that the Massachusetts Legislature was not really concerned with the protection of health when it passed this statute. MR. JUSTICE WHITE acknowledges the statutory concern with the protection of health, but finds the restriction on distributors overly broad because the State has failed to adduce facts showing the health hazards of the particular substance dispensed by appellee as distinguished from other contraceptives. MR. JUSTICE DOUGLAS' concurring opinion does not directly challenge the power of Massachusetts to prohibit laymen from dispensing contraceptives, but considers that appellee rather than dispensing the substance was resorting to a "time-honored teaching technique" by utilizing a "visual aid" as an adjunct to his protected speech. I am puzzled by this third characterization of the case. If the suggestion is that appellee was merely displaying the contraceptive material without relinquishing his ownership of it, then the argument must be that the prosecution failed to prove that appellee had "given away" the contraceptive material. But appellee does not challenge the sufficiency of the evidence, and himself summarizes the record as showing that "at the close of his lecture he invited members of the audience . . . to come and help themselves." On the other hand, if the concurring opinion means that the First Amendment protects the distribu-

tion of all articles "not dangerous *per se*" when the distribution is coupled with some form of speech, then I must confess that I have misread certain cases in the area. See, *e. g., United States* v. *O'Brien,* 391 U. S. 367, 376 (1968); *Cox* v. *Louisiana,* 379 U. S. 536, 555 (1965); *Giboney* v. *Empire Storage Co.,* 336 U. S. 490, 502 (1949).

My disagreement with the opinion of the Court and that of Mr. Justice White goes far beyond mere puzzlement, however, for these opinions seriously invade the constitutional prerogatives of the States and regrettably hark back to the heyday of substantive due process.

In affirming appellee's conviction, the highest tribunal in Massachusetts held that the statutory requirement that contraceptives be dispensed only through medical channels served the legitimate interest of the State in protecting the health of its citizens. The Court today blithely hurdles this authoritative state pronouncement and concludes that the statute has no such purpose. Three basic arguments are advanced: First, since the distribution of contraceptives was prohibited as a moral matter in Massachusetts prior to 1966, it is impossible to believe that the legislature was concerned with health when it lifted the complete ban but insisted on medical supervision. I fail to see why the historical predominance of an unacceptable legislative purpose makes incredible the emergence of a new and valid one.[1] See *McGowan*

---

[1] The Court places some reliance on the opinion of the Supreme Judicial Court of Massachusetts in *Sturgis* v. *Attorney General,* 358 Mass. ——, 260 N. E. 2d 687 (1970), to show that § 21A is intended to regulate morals rather than public health. In *Sturgis* the state court rejected a challenge by a group of physicians to that part of the statute prohibiting the distribution of contraceptives to unmarried women. The court accepted the State's interest in "regulating the private sexual lives of single persons," that interest being expressed in the restriction on distributees. *Id.,* at ——, 260 N. E. 2d, at 690. The purpose of the restriction on distributors was not in issue.

v. *Maryland,* 366 U. S. 420, 445–449 (1961). The second argument, finding its origin in a dissenting opinion in the Supreme Judicial Court of Massachusetts, rejects a health purpose because, "[i]f there is need to have a physician prescribe . . . contraceptives, that need is as great for unmarried persons as for married persons." 355 Mass. 746, 758, 247 N. E. 2d 574, 581. This argument confuses the validity of the restriction on distributors with the validity of the further restriction on distributees, a part of the statute not properly before the Court. Assuming the legislature too broadly restricted the class of persons who could obtain contraceptives, it hardly follows that it saw no need to protect the health of all persons to whom they are made available. Third, the Court sees no health purpose underlying the restriction on distributors because other state and federal laws regulate the distribution of harmful drugs. I know of no rule that all enactments relating to a particular purpose must be neatly consolidated in one package in the statute books for, if so, the United States Code will not pass muster. I am unable to draw any inference as to legislative purpose from the fact that the restriction on dispensing contraceptives was not codified with other statutory provisions regulating the distribution of medicinal substances. And the existence of nonconflicting, nonpre-emptive federal laws is simply without significance in judging the validity or purpose of a state law on the same subject matter.

It is possible, of course, that some members of the Massachusetts Legislature desired contraceptives to be dispensed only through medical channels in order to minimize their use, rather than to protect the health of their users, but I do not think it is the proper function of this Court to dismiss as dubious a state court's explication of a state statute absent overwhelming and irrefutable reasons for doing so.

Mr. Justice White, while acknowledging a valid legislative purpose of protecting health, concludes that the State lacks power to regulate the distribution of the contraceptive involved in this case as a means of protecting health.[2] The opinion grants that appellee's conviction would be valid if he had given away a potentially harmful substance, but rejects the State's placing this particular contraceptive in that category. So far as I am aware, this Court has never before challenged the police power of a State to protect the public from the risks of possibly spurious and deleterious substances sold within its borders. Moreover, a statutory classification is not invalid

> "simply because some innocent articles or transactions may be found within the proscribed class. The inquiry must be whether, considering the end in view, the statute passes the bounds of reason and assumes the character of a merely arbitary fiat." *Purity Extract & Tonic Co.* v. *Lynch,* 226 U. S. 192, 204 (1912).

But since the Massachusetts statute seeks to protect health by regulating contraceptives, the opinion invokes *Griswold* v. *Connecticut,* 381 U. S. 479 (1965), and puts the statutory classification to an unprecedented test: either the record must contain evidence supporting the classification or the health hazards of the particular contraceptive must be judicially noticeable. This is indeed a novel constitutional doctrine and not surprisingly no authority is cited for it.

Since the potential harmfulness of this particular medicinal substance has never been placed in issue in the

---

[2] The opinion of the Court states in passing that if the restriction on distributors were in fact intended as a health measure, it would be overly broad. Since the Court does not develop this argument in detail, my response is addressed solely to the reasoning in the opinion of Mr. Justice White, concurring in the result.

state or federal courts, the State can hardly be faulted for its failure to build a record on this point. And it totally mystifies me why, in the absence of some evidence in the record, the factual underpinnings of the statutory classification must be "incontrovertible" or a matter of "common knowledge."

The actual hazards of introducing a particular foreign substance into the human body are frequently controverted, and I cannot believe that unanimity of expert opinion is a prerequisite to a State's exercise of its police power, no matter what the subject matter of the regulation. Even assuming no present dispute among medical authorities, we cannot ignore that it has become commonplace for a drug or food additive to be universally regarded as harmless on one day and to be condemned as perilous on the next. It is inappropriate for this Court to overrule a legislative classification by relying on the present consensus among leading authorities. The commands of the Constitution cannot fluctuate with the shifting tides of scientific opinion.

Even if it were conclusively established once and for all that the product dispensed by appellee is not actually or potentially dangerous in the somatic sense, I would still be unable to agree that the restriction on dispensing it falls outside the State's power to regulate in the area of health. The choice of a means of birth control, although a highly personal matter, is also a health matter in a very real sense, and I see nothing arbitrary in a requirement of medical supervision.[3] It is generally acknowledged that contraceptives vary in degree of effec-

---

[3] For general discussions of the need for medical supervision before choosing a means of birth control, see Manual of Family Planning and Contraceptive Practice 47–53 (M. Calderone ed. 1970); Advanced Concepts in Contraception 22–24 (F. Hoffman & R. Kleinman ed. 1968).

tiveness and potential harmfulness.[4] There may be compelling health reasons for certain women to choose the most effective means of birth control available, no matter how harmless the less effective alternatives.[5] Others might be advised not to use a highly effective means of contraception because of their peculiar susceptibility to an adverse side effect.[6] Moreover, there may be information known to the medical profession that a particular brand of contraceptive is to be preferred or avoided, or that it has not been adequately tested. Nonetheless, the concurring opinion would hold, as a constitutional matter, that a State must allow someone without medical training the same power to distribute this medicinal substance as is enjoyed by a physician.

It is revealing, I think, that those portions of the majority and concurring opinions rejecting the statutory limitation on distributors rely on no particular provision of the Constitution. I see nothing in the Fourteenth Amendment or any other part of the Constitu-

---

[4] See U. S. Commission on Population Growth and the American Future, Population and the American Future, pt. II, pp. 38–39 (Mar. 16, 1972); Manual of Family Planning, *supra*, at 268–274, 316, 320, 342, 346; Jaffe, Toward the Reduction of Unwanted Pregnancy, 174 Science 119, 121 (Oct. 8, 1971); G. Hardin, Birth Control 128 (1970); E. Havemann, Birth Control (1967). The contraceptive substance dispensed by appellee, vaginal foam, is thought to be between 70% and 80% effective. See Jaffe, *supra*, at 121; Dingle & Tietze, Comparative Study of Three Contraceptive Methods, 85 Amer. J. Obst. & Gyn. 1012, 1021 (1963). The birth control pill, by contrast, is thought to be better than 99% effective. See Havemann, Birth Control, *supra*.

[5] See Perkin, Assessment of Reproductive Risk in Nonpregnant Women—A Guide to Establishing Priorities for Contraceptive Care, 101 Amer. J. Obst. & Gyn. 709 (1968).

[6] See Manual of Family Planning, *supra*, at 301, 332–333, 336–340.

tion that even vaguely suggests that these medicinal forms of contraceptives must be available in the open market. I do not challenge *Griswold* v. *Connecticut, supra,* despite its tenuous moorings to the text of the Constitution, but I cannot view it as controlling authority for this case. The Court was there confronted with a statute flatly prohibiting the use of contraceptives, not one regulating their distribution. I simply cannot believe that the limitation on the class of lawful distributors has significantly impaired the right to use contraceptives in Massachusetts. By relying on *Griswold* in the present context, the Court has passed beyond the penumbras of the specific guarantees into the uncircumscribed area of personal predilections.

The need for dissemination of information on birth control is not impinged in the slightest by limiting the distribution of medicinal substances to medical and pharmaceutical channels as Massachusetts has done by statute. The appellee has succeeded, it seems, in cloaking his activities in some new permutation of the First Amendment although his conviction rests in fact and law on dispensing a medicinal substance without a license. I am constrained to suggest that if the Constitution can be strained to invalidate the Massachusetts statute underlying appellee's conviction, we could quite as well employ it for the protection of a "curbstone quack," reminiscent of the "medicine man" of times past, who attracted a crowd of the curious with a soapbox lecture and then plied them with "free samples" of some unproved remedy. Massachusetts presumably outlawed such activities long ago, but today's holding seems to invite their return.