**Bill BAIRD**

v.

**State Police Officer Eugene BIAGIOTTI, and Unnamed Police Officer, sued in their official and individual capacity.**

Civ. A. No. 88–6279.

United States District Court, E.D. Pennsylvania.

Jan. 9, 1989.

Stefan Presser, American Civil Liberties Union of Pennsylvania, Philadelphia, Pa., for plaintiff.

Eugene Glogiotti by Laura Fredricks, Office of Atty. Gen., Philadelphia, Pa., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

Plaintiff filed this action alleging a violation of his first amendment rights and 42 U.S.C. § 1983. Pursuant to a stipulation between the parties, the unnamed police officer was dismissed from his action prior to trial. After a bench trial, the court will enter judgment in favor of the defendant Biagiotti based on the following Findings of Fact and Conclusions of Law made in accordance with Fed.R.Civ.P. 52(a).

*Findings of Fact*

1. Plaintiff Bill Baird has been a life-long advocate of the right of individual reproductive freedom. As a result of his dedication throughout the last 25 years, plaintiff has been involved in several successful legal challenges to secure reproductive freedom for unmarried persons in *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) and for minors in *Bellotti v. Baird*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976).

2. In 1964, plaintiff founded the Bill Baird Institute offering reproductive health counseling.

3. Plaintiff acquired a picture of a naked woman lying on the floor, who allegedly had died as a result of an attempt to abort herself prior to the legalization of abortion. Plaintiff has used this photograph previously in expressing his views that abortion is, and should remain, a legal option available to pregnant women.

4. When plaintiff learned that individuals opposed to reproductive freedom planned to prevent women from obtaining abortion services during the week of July 4, 1988, by blockading various abortion clinic entrances in the Philadelphia area, he decided to come to Philadelphia to act as a one-person counter-vigil. On the morning of Tuesday, July 5, 1988, plaintiff arrived at the Paoli Women's Center which had been targeted by anti-abortionists calling themselves "Operation Rescue." Plaintiff brought the above-mentioned poster with him in order to communicate his opposition to the conduct of these individuals.

5. During the day, as a result of advanced warning, approximately 60 law enforcement officers, gathered from various law enforcement agencies, effectuated approximately 590 arrests of Operation Rescue demonstrators.

6. On that day, defendant Biagiotti, a Community Relations Officer of the Pennsylvania State Police since 1970, was assisting the Tredyffrin Township Police Department by observing and monitoring the demonstration. Although in plain clothes, defendant had the power to make arrests.

7. Plaintiff was not arrested on July 5, 1988.

8. Plaintiff arrived at the Clinic at approximately 7:30 a.m. and stayed until approximately 6:00 p.m.

9. Plaintiff was able to move freely about the Clinic parking lot, and driveways throughout the day.

10. Plaintiff was not prohibited in any manner from conversing with anyone about his pro-choice views.

11. Plaintiff was not prohibited in any manner from distributing any literature to anyone regarding his pro-choice views.

12. Plaintiff was not prohibited in any manner from being interviewed by the media throughout the day.

13. Approximately 150–200 anti-abortionist demonstrators who were arrested and released, came back and remained outside the secured area in the driveways.

14. Several anti-abortion demonstrators passed derogatory remarks at State Trooper Biagiotti because they thought he was sympathetic to the pro-choice cause.

15. At one point in the afternoon, plaintiff and a priest were being interviewed by the media. Plaintiff took exception to the priest allegedly brushing up against plaintiff. State Trooper Biagiotti thought there might have been a confrontation between the priest and plaintiff and took the priest aside and asked him to remain calm and peaceful.

The matter was resolved and the priest later told Trooper Biagiotti that the priest appreciated the trooper's intervention in resolving the confrontation.

16. At approximately 4:30, State Trooper Biagiotti saw plaintiff inside the barricaded area, the parking lot to the Clinic, talking to a news cameraman.

17. Plaintiff was approximately 15–18 feet away from the crowd of approximately 100–200 anti-abortion demonstrators and State Trooper Biagiotti and Trooper Andrew McCauley were approximately 10 feet away from plaintiff.

18. In the immediate vicinity of plaintiff, the crowd and the State Troopers, there were several police officers.

19. Some of these demonstrators at approximately 4:30 p.m. were peacefully singing and chanting in a circle, and some were standing in rows up against the barricade in a peaceful and calm manner.

20. Plaintiff was approached by news media personnel for interviews. He agreed to be interviewed live, on-camera, by Channel 10 for its 5 o'clock p.m. broadcast and by Channel 6 for its evening broadcast. The interviews took place in a closed-off area separated by police barricades from Operation Rescue demonstrators, who were peaceful and orderly at that time. As the first of these interviews was about to begin, plaintiff took out his poster to use as an adjunct to his presentation and held it in front of the cameras for the television audience.

Plaintiff also held the poster above his head and faced it in the direction of the anti-abortion demonstrators.

21. Upon seeing the poster, the mood and actions of the crowd changed: the singing stopped, the praying stopped, and their attention was drawn to plaintiff's poster displayed over his head. The crowd began to yell at plaintiff and pressed forward against the police barricades.

22. At this moment there existed the possibility that the crowd would become violent, and that there may be a riot or physical confrontation.

23. Based on State Trooper Biagiotti's experience as a community relations officer, he believed that he had to act immedi-

ately to prevent a possible physical confrontation and riot.

24. State Trooper Biagiotti felt that plaintiff's safety was in jeopardy and that a breach of peace was imminent. State Trooper McCauley independently came to the same conclusion.

25. State Trooper Biagiotti and Trooper McCauley immediately walked up to plaintiff.

26. State Trooper Biagiotti requested or suggested that plaintiff put his poster away because it was inciting the crowd.

27. State Trooper Biagiotti did not threaten to arrest plaintiff unless he failed to put the poster away.

28. State Trooper Biagiotti did not order plaintiff to put the poster away but expressed himself in the form of a request.

29. State Trooper Biagiotti asked plaintiff to put his poster away because it was inciting the crowd and he felt there was a possibility that the crowd would become violent having been taunted by plaintiff's poster.

30. State Trooper Biagiottti did not ask, tell, order or instruct plaintiff not to show the media the poster and did not ask, tell, order or instruct plaintiff that he could not display it during plaintiff's live interviews with the media.

31. Plaintiff promptly complied with State Trooper Biagiotti's request and put the poster away.

After this was done, the crowd calmed down, ceased yelling and taunting plaintiff, and resumed its prior calm and peaceful activities.

32. A few minutes later, plaintiff conducted two live interviews with Channel 10 and Channel 6 news.

33. Plaintiff chose not to display his poster during the television interviews.

34. State Trooper Biagiotti did not have time to call other police officers in the vicinity to help before he acted because he felt he had to act immediately to prevent the imminent threat of violence and riot.

35. State Trooper Biagiotti acted to prevent the imminent threat of physical harm and to maintain peace and order.

Trooper Biagiotti's conduct in requesting or suggesting that plaintiff put away the poster was a reasonable course of action.

36. The court finds that Trooper Biagiotti's testimony was fully credible. His credibility is bolstered by the testimony regarding his actions on that day prior to this incident (e.g., he did not prevent the display of equally graphic posters displayed by the anti-abortion protesters) and his prior experiences as a community relations officer.

37. Andrea Weitman testified on behalf of plaintiff. As a result of cross-examination of Ms. Weitman, the Court finds that her testimony and account of the incident was less than fully credible, and the court has discounted her testimony accordingly.

*Conclusions of Law*

1. Plaintiff did not prove, by a preponderance of the evidence, that Trooper Biagiotti ordered him to put away the poster in question.

2. Plaintiff failed to prove, by a preponderance of the evidence, that he had not simply acquiesced in a request or suggestion of Trooper Biagiotti to put the poster away.

3. Section 1983 provides that any citizen may recover money damages against any person who under the color of state law knowingly subjects that citizen to the deprivation of any rights protected by the United States Constitution.

To recover under section 1983, the plaintiff must prove by a preponderance of the evidence that:

(1) the defendant acted under the color of state law.

(2) the defendant acted intentionally or recklessly.

(3) the acts and conduct of the defendant were the proximate cause of the injuries, if any, suffered by the plaintiff and,

(4) the defendants' actions deprived the plaintiff of the plaintiff's rights secured to

him by the constitution of the United States.

4. Plaintiff's first amendment rights were not violated by the actions of Trooper Biagiotti.