James K. Bonham, Petitioner *v.* State Board of Examiners of Nursing Home Administrators, Respondent.

Argued March 11, 1977, before Judges CRUMLISH, JR., KRAMER and ROGERS, sitting as a panel of three.

*Charles O. Barto, Jr.*, with him *Killian & Gephart*, for petitioner.

*Louis B. Rubin*, Assistant Attorney General, with him *Robert P. Kane*, Attorney General, for respondent.

OPINION BY JUDGE KRAMER, July 12, 1977:

This is a petition for review filed by James K. Bonham (Bonham) to an order of the State Board of Examiners of Nursing Home Administrators (Board), dated May 25, 1976. The order denies Bonham's application to sit for the nursing home administrators licensure examination. We will affirm.

Bonham owns the Bonham Nursing Center (Center), a 49-bed, skilled nursing care facility. The Center was licensed by the Commonwealth as a nursing home on January 29, 1975. Under Section 3 of the Nursing Home Administrators License Act, Act of June 22, 1970, P.L. 378, 63 P.S. §1103, the administrator of such a facility must be licensed by the Commonwealth. Because Bonham wished to serve the Center in such a capacity, he applied to sit for the administrators' licensure examination. His application, however, was denied. The reason given for the denial was that he did not satisfy any one of the alternate eligibility requirements set forth under Section 39.5(b) of the State Board of Examiners of Nursing Home Administrators Rules and Regulations, 49 Pa. Code §39.5(b).

At the time pertinent to the denial of Bonham's application, Section 39.5(b) provided:[1]

39.5 Requirements

(b) A candidate for examination for licensure shall also meet the following requirements:

(1) Prior to June 30, 1972, was serving as a provisional licensed nursing home administrator or on a temporary permit and continues in such capacity up to and including the date of application to take the examination; or

---

[1] Although not pertinent to this case, these requirements have since been amended at 5 Pa. B. 931, April 19, 1975 and 6 Pa. B. 418, March 6, 1976.

(2) Has served as a nursing home administrator for two years or more during the past five years; or

(3) Prior to January 1, 1977, has graduated from a high school or secondary school approved or recognized by the educational authorities of the state in which such school is located, or a political division thereof, or has submitted a certificate of learning indicating that he has obtained high school or secondary school equivalency and has for the 36 months immediately preceding the date of application, successfully served in a full time capacity as an assistant administrator or co-administrator and has attended and successfully completed board approved specialized courses or a program of study in an area relevant to nursing home administration; or

(4) A registered professional nurse, licensed in the state of Pennsylvania, who has for the 18 months immediately preceding the date of application, served in a full time capacity in a nursing home and has attended and successfully completed board approved specialized courses or a program of study in an area relevant to nursing home administration; or

(5) Has a baccalaureate degree or higher degree from an accredited college or university and has, for the six months immediately preceding the date of application, successfully served in a full time capacity as an assistant administrator or co-administrator in a nursing home under the direct supervision under a licensed administrator;

(6) Has a baccalaureate degree or higher degree from an accredited college or university

and served as a hospital administrator for two or more of the last five years; or

(7) Has a masters' degree from an accredited college or university in nursing home administration or hospital administration.

Bonham believed that he fulfilled the Section 39.5 (b) requirement under subsections (2) and (3). He therefore requested a hearing before the Board to show cause why his application should not be denied. This was conducted on December 8, 1975. In an attempt to sustain his burden, Bonham presented the following evidence relating to his compliance with the licensing requirements: (1) He had served as the "administrator" for Benscoter Home for Mentally Retarded Children (Benscoter) from 1959 through 1973; (2) He spent approximately 25 hours per week in fulfilling his responsibilities at Benscoter; (3) Although he worked full time during this period as a lab supervisor for a carpet company, his special employment relationship allowed him to be on 24-hour call to Benscoter; and (4) His responsibilities as the "administrator" of Benscoter included involvement in all major decisions, such as the selection of personnel and the resolution of the Home's financial matters.

The Board found that the evidence showed that Bonham had neither served in an administrator's capacity at Benscoter nor that Benscoter was a "nursing home" as contemplated under the Rules and Regulations for the licensure of nursing home administrators. On the basis of these findings, the Board concluded that Bonham fell short of fulfilling the Section 39.5(b) requirements under either subsection (2) or (3), and denied his application.

On review, Bonham argues that the Board's findings and conclusions are not supported by substantial evidence and are in error of law. In addition, he ar-

gues that the Board's decision denies him equal protection under the law inasmuch as other persons with experience similar to his were permitted to sit for the examination.

We will first consider the Board's finding that Benscoter, a 16-bed mental retardation facility, was not shown to be a "nursing home." Section 39.1 of the Rules and Regulations for the licensing of "nursing home" administrators provides the following definition of "nursing home":

> Nursing home—Any institution or facility in which nursing care and related medical or other health services are provided for a period exceeding 24 hours, for two or more individuals, who are not relatives of the administrator, who are not acutely ill and not in need of hospitalization, but who, because of age, illness, disease, injury, convalescence, or physical or medical infirmity, need such care. A 'nursing home' shall also include an intermediate care facility as defined in 45 C.F.R. §249.10(b)(15), (relating to amount, duration, and scope of medical assistance). 49 Pa. Code §39.1.

Bonham's argument that Benscoter falls within this definition is based upon the premise that the Department of Public Welfare reimbursed Benscoter for the services it provided while in operation.[2] He contends that this fact demonstrates that the Department recognized Benscoter as a qualified mental retardation unit. As such a facility, he argues that Benscoter should be encompassed by the definition of "nursing home" for two reasons. The first is that a mental retardation unit was considered a "nursing home" under the definition used by the Department of Public Welfare while Benscoter was in operation. It is the re-

---

[2] Benscoter discontinued its operation in 1973.

sult of a clerical error in the licensing definition of "nursing home" that Benscoter is now deemed not to be included. The second is that a mental retardation unit, such as Benscoter was recognized to be, is included among the facilities deemed to be an intermediate care facility. It is apparent that an intermediate care facility is considered a "nursing home" under the present definition utilized by the Board in its Rules and Regulations for the licensure of administrators.

Bonham argues that the definition formerly found under Section 1001 of the Public Welfare Code, Act of June 13, 1967, P.L. 31, *as amended*, 62 P.S. §1001 (since reorganized at 71 P.S. §755-2), encompassed Benscoter within its scope. Section 1001 of the Public Welfare Code provided:

'Nursing home' means any premises operated for profit in which nursing care and related medical or other health services are provided, for a period exceeding twenty-four hours, for two or more individuals, who are not relatives of the operator, who are not acutely ill and not in need of hospitalization, but who, because of age, illness, disease, injury, convalescence or physical or *mental* infirmity need such care. (Emphasis added.)

Federal legislation under Title XIX of the Social Security Act (Grants to State Medical Assistance Programs), 42 U.S.C. §1396(g) required, however, that for state medical assistance programs to be eligible for grants, all State "nursing home" administrators must be licensed. It is Bonham's contention that when the Pennsylvania Legislature enacted the Nursing Home Administrators License Act in 1970 to comply with this provision, a clerical error was made in the definition of "nursing home" used in the statute. His argument is that the Legislature's intention, as evidenced by the similarities of the definitions, was to

enact a definition similar in scope to the one then effective under Section 1001 of the Public Welfare Code. The definition of "nursing home" adopted under Section 2 of the Nursing Home Administrators License Act, 63 P.S. §1102, provides:

> (3) 'Nursing home' means any institution or facility in which nursing care and related medical or other health services are provided for a period exceeding twenty-four hours, for two or more individuals, who are not relatives of the administrator who are not acutely ill and not in need of hospitalization, but who, because of age, illness, disease, injury, convalescence or physical or *medical* infirmity need such care. (Emphasis added.)

Bonham illustrates that this definition is similar in all material respects to that formerly used in the Public Welfare Code, except for one. This is that the adjective "medical" was substituted for "mental" in the phrase "mental infirmity." He contends that this substitution of words was unintentional. Thus, because the Board adopted the definition used in the Legislature's License Act for its Rules and Regulations, Bonham argues that Benscoter should be considered a "nursing home" as it previously had been under the Public Welfare Code and that the present constricted scope of the definition should be ignored.

We believe this argument to be without merit. Under the definition formerly used in the Public Welfare Code, a showing that Benscoter was recognized as a mental retardation unit did not qualify it as a "nursing home." Traditionally in Pennsylvania, a mental retardation facility was something apart from a "nursing home." Section 1001 of the Public Welfare Code, 62 P.S. §1001, illustrates this point. This Section includes the care for mental retardation within the definition for a mental health establishment. A mental

health establishment was defined separately from a "nursing home." These facilities also had different licensing fees under Section 1006 of the Public Welfare Code, 62 P.S. §1006. It is apparent therefore that a mental retardation unit was contemplated to be something other than a "nursing home" under the Public Welfare Code. Such a result seems clear despite the Code's confusing utilization of the phrase "mental infirmity" within its definition of "nursing home."

Separate conceptions of "nursing homes" and mental retardation facilities are also apparent on the federal level. Arguably, the definition of "nursing home" adopted under the Administrators License Act and the Board's Rules and Regulations, was purposely constructed to comply with the Title XIX of the Social Security Act by more clearly reflecting the distinction between the facilities. Title XIX called only for the licensing of administrators to "nursing homes." Furthermore, the Act defines a skilled nursing facility separately from a facility for mental retardation. Under the Act, a mental retardation facility is included within those institutions deemed to be intermediate care facilities, 42 U.S.C. §1396(d). It was reasonable therefore that the Pennsylvania Legislature clearly delineated what was included under the term "nursing home," by substituting the more precise word "medical" for the word "mental," in the phrase "mental infirmity" used in the Public Welfare Code definition of "nursing home." As illustrated, this was consistent with Pennsylvania's past understanding of the term "nursing home." It is also consistent with the intent and language found under the Social Security Act.

Although the point is not adequately developed by the parties' briefs in this case, it should be noted that the present definition of "nursing home" under the Board's Rules and Regulations encompasses federally-defined intermediate care facilities within its scope.

The argument is therefore available that, as intermediate care facilities under Title XIX include mental retardation facilities, then Benscoter as such a facility is included within the Board's present definition.[3] This argument can be resolved by examining the federal regulations published in 1974 pertaining to the various institutions deemed to be within state medical assistance programs. 45 C.F.R. §249. Section 249.12(c)(2) of these regulations informed the States that intermediate care facilities were also to be run by licensed administrators. Section 249.10(b)(15)D, however, indicates that only those mental retardation facilities which comply with the exhaustive standards under Section 249.13 are deemed to be intermediate care facilities under the Social Security Act.

Applying this to the facts now before this Court, we must conclude from the record that Benscoter was not shown to be an intermediate care facility as federally defined. Although Bonham presented evidence demonstrating the type of person housed at Benscoter, there was no attempt to show that Benscoter complied with any of the numerous standards under Section 249.13.

We conclude, therefore, that under the Board's definition for the licensing of administrators, Benscoter was not shown to be a "nursing home." Because Bonham could not comply with either subsection (2) or (3) under Section 39.5(b) of the Board's Rules and Regulations without Benscoter being deemed a "nursing home," we need not review the Board's finding that

---

[3] The last sentence of the definition "nursing home," found in the Board's licensure Rules and Regulations, includes within its scope federally-defined intermediate care facilities. This sentence was added to the definition on March 13, 1975, 5 Pa. B. 931. Bonham's hearing was held on December 8, 1975; therefore the provision was applicable at the time the hearing was held.

Bonham was not acting in the capacity of an administrator at Benscoter.

We now turn to Bonham's final argument that the Board's determination denies him equal protection under the law for the reason that other "administrators" of mental retardation facilities were permitted to sit for the licensure examination. Equal protection under the law requires that all persons similarly circumstanced shall be treated alike. *Eisenstadt v. Baird,* 405 U.S. 438, 447 (1972). Here, there was no showing that an administrator of a mental retardation facility similar to Benscoter was allowed to sit for the examination. The fact that Benscoter was not deemed to have been a "nursing home" sets it apart from those mental retardation facilities which may be encompassed within the Board's definition. The operation of a skilled nursing facility or intermediate care facility in Pennsylvania must be conducted in compliance with extensive State regulations. Sections 201-217, 28 Pa. Code §201-217. To perform as an administrator in such a situation requires a degree of education and experience. It is rational and reasonable therefore for Pennsylvania to require those desiring to be administrators of such facilities to meet specific requirements. As Bonham has not demonstrated that he has fulfilled these requirements or that a person circumstanced as he, was allowed to sit for the administrators licensure examination, we conclude that there was no showing that Bonham has been denied equal protection under the law.

ORDER

AND Now, this 12th day of July, 1977, the order of the State Board of Examiners of Nursing Home Administrators, dated May 25, 1976, denying James K. Bonham's application to sit for the nursing home administrators licensure examination, is hereby affirmed.