640 A.2d 427

**Estate of C.W., an Alleged Incompetent.**

**Appeal of Lorrie McKINLEY, Esq.,
Guardian Ad Litem for C.W.**

Superior Court of Pennsylvania.

Argued Dec. 7, 1993.

Filed March 28, 1994.

Lorrie McKinley, Philadelphia, appellant.

Marta Engdahl, Merion, for participating party.

Before ROWLEY, President Judge, McEWEN, DEL SOLE, BECK, TAMILIA, POPOVICH, JOHNSON, HUDOCK and FORD ELLIOTT, JJ.

BECK, Judge.

The issue presented in this case is whether a guardian with authority to consent to a tubal ligation should be appointed for C.W., a 24 year old mute woman with a mental age of 3-5. She suffers from moderately severe retardation, grand mal epilepsy, cerebral palsy and scoliosis. The trial court determined that it was in C.W.'s best interest that her mother be appointed as her guardian, with specific authority to consent to a laparoscopic tubal ligation.

The trial court's decision reflects an exceedingly careful consideration of the voluminous record and is in accord with the law of this Commonwealth. We affirm.

We have carefully examined the record in this case to determine whether it supports the judge's findings regarding C.W.'s mental and physical condition. We have also reviewed the expert opinions regarding the available medical and non-medical options, and the governing legal standards. We begin by emphasizing that in this case we are not confronted with a legal tabula rasa. The standards governing a determination of whether sterilization of an incompetent is to be permitted were established in 1982 in *In the Matter of Mildred J. Terwilliger*, 304 Pa.Super. 553, 450 A.2d 1376 (1982), and our analysis simply applies the legal principles established in *Terwilliger* to the facts of this case.[1]

In *Terwilliger*, the father of a mentally retarded woman sought to have the court declare his daughter incompetent and to have himself appointed as her guardian for the purpose of consenting to her sterilization by tubal ligation. The trial court granted both requests. On appeal, a panel of this court reversed and remanded for further proceedings. The *Terwilliger* court first determined that the Orphans' Court had jurisdiction to grant the requested relief.[2] The court then proceeded to establish clear guidelines for the decision of such cases. The court began with the following cautionary statements:

> We caution that because sterilization necessarily results in the permanent termination of the intensely personal right of procreation, the trial judge must take the greatest care to ensure that the incompetent's rights are jealously guarded.

1. While this case was pending on appeal, the Pennsylvania legislature enacted certain revisions to Title 20 (Decedents, Estates and Fiduciaries) of the Pennsylvania Consolidated Statutes. *See, e.g.*, 20 Pa.C.S.A. § 5521 (1992). In part, these revisions relate to the appointment and powers of guardians of incapacitated persons. Although the revisions do not apply to the case before us, we note that the revisions do confirm the jurisdiction of the court of common pleas, including the Orphans' Division, over the appointment of guardians and require that the court grant specific authority to a guardian to consent to a sterilization of an incapacitated person.

2. The jurisdiction of the court of common pleas to grant such relief is not at issue in this appeal.

[I]n making the decision of whether to authorize sterilization, a court should consider *only* the best interest of the incompetent person, not the interests or convenience of the individual's parents, the guardian or of society.

*Id.* at 564, 450 A.2d at 1382 (emphasis supplied).

Thus, the *Terwilliger* court recognized that a decision that an incompetent should undergo a sterilization procedure impinges on that person's fundamental right to procreate and involves an invasion of that person's bodily integrity.

With these principles in mind, the *Terwilliger* court made several procedural determinations. First, the court found that given the fundamental right involved in such cases, the party seeking approval of the sterilization procedure had the burden of proof and that the standard of proof required was that of clear and convincing evidence. *Id.* Even more importantly, the *Terwilliger* court established that the crucial question to be answered in such cases was whether the sterilization was in the *best interest* of the incompetent.

The court then required that a guardian ad litem be appointed to represent the interests of the incompetent at the hearing, that comprehensive medical, psychological and social evaluations be made of the incompetent, and that the trial court be permitted to appoint its own experts to assist in the evaluation of the incompetent. Further, the court stated that although the incompetent need not be at the hearing, the trial court should meet with the incompetent to form the court's own opinion as to competency and elicit any views regarding the sterilization that the incompetent would be able to express.

Having established these procedural ground rules, the *Terwilliger* court mandated two specific findings by the trial court as necessary prerequisites to authorizing the sterilization. First, the court must find that the individual lacks capacity to make a decision about sterilization and that the incapacity is not likely to change in the foreseeable future. Second, the court must find that the incompetent is capable of reproduction. If the court is able to make these findings, then the

court must proceed to its ultimate determination, i.e., is sterilization in the incompetent's best interest?

*Terwilliger* viewed the best interest determination as ultimately depending on a finding that:

sterilization is the only practicable means of contraception, i.e., all less drastic contraceptive methods, including supervision, education and training are unworkable and detailed medical testimony must show that the sterilization procedure requested is the least significant intrusion necessary to protect the interests of the individual.

*Id.* at 566, 450 A.2d at 1383.

The *Terwilliger* court provided the following non-exclusive list of "guidelines", adopted from the decision of the Supreme Court of New Jersey in *In re Grady*, 85 N.J. 235, 426 A.2d 467 (1981), to assist the trial court in making this decision:

(2) The possibility that the incompetent person will experience trauma or psychological damage if she becomes pregnant or gives birth, and, conversely, the possibility of trauma or psychological damage from the sterilization operation.

(3) The likelihood that the individual will voluntarily engage in sexual activity or be exposed to situations where sexual intercourse is imposed upon her.

(4) The inability of the incompetent person to understand reproduction or contraception and the likely permanence of that inability.

(7) The ability of the incompetent person to care for a child, or the possibility that the incompetent may at some future date be able to marry and, with a spouse, care for a child.

(8) Evidence that scientific or medical advances may occur within the foreseeable future which will make possible either improvement of the individual's condition or alternative and less drastic sterilization procedures.

(9) A demonstration that the proponents of sterilization are seeking it in good faith and that their primary concern is for the best interests of the incompetent person rather than their own or the public's convenience.

*Id.,* 304 Pa.Super. at 567, 450 A.2d at 1383–84 (quoting *In re Grady, supra* ).

Despite the apparent specificity of these guidelines, the *Terwilliger* court wisely allowed the trial court latitude in making the ultimate determination of the best interests of the incompetent. Thus, the court expressly stated that the list was not exhaustive, and that the weight to be accorded to each factor would appropriately vary in each case.

It is against this clear legal standard that we must judge whether it is in the best interests of C.W. that a guardian, with authorization to consent to a tubal ligation of C.W., be appointed.[3]

As to the appellate court's standard of review, the *Terwilliger* court instructed:

Additionally, because of the sensitive and irrevocable nature of a sterilization operation, we wish to make it clear that appellate review of the instant type of case will be of the broadest scope, and this court will not be bound by the inferences or deductions of the lower court.

*Id.* at 568, 450 A.2d at 1384.

We begin with a brief statement of the procedural history of this matter, followed by a general description of C.W.'s physical and mental disabilities, her personality and emotional nature, and her living arrangements and activities. We then proceed to a thoroughgoing review of the expert opinion testimony received by the trial court insofar as it is pertinent to each of the findings and guidelines identified in *Terwilliger.*

**3.** Amici curiae, Pennsylvania Protection & Advocacy, Association for Retarded Citizens—Pennsylvania, Association for Retarded Citizens—Allegheny County, American Civil Liberties Union of Greater Pittsburgh, and The Association for Persons with Severe Handicaps—Pennsylvania, argue that we should modify *Terwilliger.* Amici seek to have us require that no incompetent be sterilized unless the court has first found that there is clear and convincing evidence that the incompetent is already engaged in voluntary sexual activity. Amici urge that we eliminate all consideration of the likelihood that an incompetent who is not already engaging in voluntary sexual activity might do so in the future or of the likelihood that the incompetent may be sexually abused. This is in clear contravention of the *Terwilliger* standard, of which we fully approve, and would not be a salutary change in the law.

Finally, we analyze all of this information in light of the dictates of *Terwilliger.*

## PROCEDURAL HISTORY

This action was initiated in the Orphans' Court Division of the Court of Common Pleas for Philadelphia County through the filing of a petition by C.W.'s mother (sometimes hereinafter referred to as "petitioner"). Petitioner sought appointment as C.W.'s guardian, with specific authority to consent to the performance of a tubal ligation on C.W. As required by *Terwilliger,* the trial court appointed a guardian ad litem to represent the interests of C.W. Both the petitioner and the guardian ad litem engaged numerous experts to examine C.W., to opine on her mental and physical condition and, more specifically, to address the subject of her best interests in regard to contraception and sterilization. Very early in the proceedings, the guardian ad litem took the position that performance of a tubal ligation was not in C.W.'s best interests.

Hearings were held on March 22, April 14, April 15, May 12 and June 6, 1988. At these hearings, extensive testimony from witnesses called by both parties was taken. The trial judge determined that it was not fruitful for C.W. to be present, in that she clearly could not participate and did not understand the proceedings. The trial judge did personally interview C.W. in chambers. After the completion of the initial hearings, the trial judge determined that she needed additional expert testimony, and engaged the services of Dr. Bolognese, Chairman of the Department of Gynecology and Obstetrics at Pennsylvania Hospital. Further hearings were conducted on August 17, 1989, at which Dr. Bolognese testified. At the request of petitioner, additional testimony from certain witnesses who had previously testified and from certain new witnesses was taken at a final hearing on October 4, 1989.

On February 28, 1990, the trial court entered an order granting the petition and authorizing the petitioner to consent to the performance of a laparoscopic tubal ligation on C.W.

The trial court accompanied its order by a 53 page opinion in which it reviewed the extensive testimonial and documentary evidence and analyzed it under the *Terwilliger* standard. Exceptions filed by the guardian ad litem were denied by an en banc panel of the Orphans' Court and the trial court's order was made final by decree entered August 1, 1991. This timely appeal ensued.[4]

*GENERAL BACKGROUND*

C.W. is a 24 year old woman who has suffered since infancy from scoliosis, cerebral palsy, grand mal epilepsy and moderately severe retardation. Although the precise cause of her condition is not clear, it is agreed that her mental and physical disabilities are irreversible. Her seizure disorder is extremely severe. In some years of her life, C.W. has experienced over 50 seizures, some of which are severe and can last for over an hour. Every day she is administered three drugs, Phenobarbital, Dilantin and Tegritol, some in toxic doses, to control her epilepsy. Even this treatment is not fully effective. Any virus, infection or fluctuation in her temperature may affect her medications and cause her to have a seizure. Without medication, she could experience status epilepticus where she would seize repeatedly. Such attacks are known to be fatal.

The record reveals at least one specific example of the severity and instability of C.W.'s epileptic status. At one point in 1989, C.W.'s behavior became more aggressive and self-abusive. It was thought that her Dilantin level was too high and was possibly contributing to her behavior problem. Although her neurologist was reluctant to do so, the Dilantin dosage was reduced. C.W. then experienced a severe seizure and her medication level had to be increased to a toxic level to stabilize her. Even at this level, C.W. seized again. C.W.'s primary physician identified this episode as a reminder of how difficult it is to control C.W.'s epilepsy.

C.W. suffers from organic brain damage and is mute. She communicates in a very limited fashion through minimal sign-

4. As this recitation reveals, the trial court assiduously followed the procedural requirements of *Terwilliger* in its handling of this case. Neither party argues to the contrary.

ing and making certain noises that those around her have learned to interpret. Experts who have evaluated C.W. agree that her mental age is in the range of a three to five year old and that her I.Q. is in the range of 30 to a possible high of 50.

Perhaps the best indication of who C.W. is can be gleaned from her interaction with the trial judge, who saw her in the courtroom at the beginning of the hearings in this matter and who later interviewed C.W. privately in chambers, as required by *Terwilliger*. When C.W. was in the courtroom, she was completely oblivious to what was happening around her. She reacted only when her name was spoken. She had with her a Sesame Street hand puppet, which she frequently waved at the judge. When interviewed, C.W. revealed a pleasant and affectionate nature. She hugged various people whom she had never before met. The trial judge described the session as follows:

[C.W.] concentrated primarily on a Walkman tape. She signed that she had brought her nephew, Ricky, into this world, that girls differ from boys in that women carry purses. In response to questioning, she signed, without differentiation, that she would like to have a baby, that she would also like to have a puppy, that babies can be bought in a store and that her brother and sister-in-law had bought her nephew, Ricky. When asked to write her name, she wrote her first name. She willingly hugged everyone in the room, including a male court clerk who was called in to test her response to an unknown male. She did not know the differences between male and female. When asked how "babies get in tummies," she pointed to a necklace on a doll. She paid scant attention and drifted from any area on which the Court tried to focus her attention. She was able to write "dog" when shown a picture of the Judge's puppy and was able to distinguish between statuettes of a dog and a rabbit. She was extremely suggestible, compliant and anxious to please. Her affect was that of an uncommunicative pre-school child. It would have been futile and well beyond

her ken to have discussed reproduction and contraception with her.

Trial Court Opinion, at 5–6.

C.W.'s legal residence is with her mother at her home in Philadelphia. However, since C.W. was twelve she has lived in a community living arrangement (a "CLA") operated by Ken Crest Centers, Inc. C.W. was placed in the CLA because she had become increasingly difficult to control at home, sometimes refusing to eat or take her medications and disrupting the rest of the family. Although at the time of the hearings in this matter C.W. lived in a CLA in which a total of five disabled persons lived, it would appear that she is now living with only two other people. Every other week, C.W. spends her weekend at her mother's home. She also goes home for holidays. While there, she often visits her brother's home.

At the time of the initial hearing, C.W. was attending a life skills program at Northeast High School and on alternate weeks she attended Swenson Skills Center. During these proceedings, however, she graduated from her high school program and was to begin working in a sheltered workshop for the mentally disabled. It is anticipated that, if sufficient funding is available, C.W. will continue to live in a CLA and go to the sheltered workshop.

In summary, C.W. has a mental age of between 3 and 5 and communicates on a minimal level. Her physical disabilities, including epilepsy, cerebral palsy and scoliosis, mean that she lives in a fragile and unpredictable state.

## REQUIRED PRELIMINARY FINDINGS

### Capacity of C.W. to Make a Decision About Sterilization

C.W.'s inability to make a decision concerning her own sterilization is beyond dispute. C.W. has no understanding of sexual or reproductive functions. As the trial judge noted, C.W. cannot identify the differences between men and women. All the experts who testified at the hearing and rendered an opinion on this subject stated that C.W. is not competent to

given informed consent to a sterilization procedure or any other medical procedure, and never will be.

*Reproductive Capability*

Gynecological examination of C.W. revealed nothing that would indicate that she is incapable of reproduction. She has experienced normal development of her reproductive organs and has a regular menstrual cycle. Although C.W. has never been pregnant, all the experts qualified to express an opinion on this subject agreed that there was no reason to believe that C.W. was incapable of reproduction.

## BEST INTEREST DETERMINATION

In analyzing the ultimate question of what is in C.W.'s best interest, we must consider, as did the trial court, the various factors enumerated in *Terwilliger*, in light of pertinent information in the record. Several of the *Terwilliger* factors merit little discussion, since they are not subject to serious dispute.

First, addressing factor 2, the evidence squarely supports the trial court's conclusion that C.W. might well experience severe, even life threatening, trauma were she to become pregnant. In contrast, the possibility of trauma or psychological damage resulting from the proposed tubal ligation is minimal. Expert testimony revealed that although the physical effect of a pregnancy on C.W.'s epileptic status was unknown, it might well be extremely damaging. Dr. Seitz, a board certified gynecologist, testified as follows regarding the various predictable effects of a pregnancy on C.W.:

> [T]he old thought was a third of the patients with epilepsy becoming pregnant will experience more frequent seizures, a third will not be affected, and a third will actually improve.
>
> Now, that's the better end of the scale. There are other studies that show from 45 to 50 percent of epileptics will be more seizure prone during pregnancy.
>
> . . . .
>
> . . . so I think there is a distinct possibility of aggravating the condition with pregnancy. Pregnancy I think would be extremely traumatizing emotionally. . . .

I think a therapeutic interruption of the pregnancy could well be extremely traumatic as well as carry with it the usual complications of perforation and hemorrage and infection,. . . .

The other experts who testified on the question of the effect of a pregnancy on C.W., including Dr. Sternbach, C.W.'s primary physician, and Dr. Bolognese, the impartial expert who testified at the trial court's request, concurred in the view that pregnancy is highly inadvisable for C.W. The testimony revealed that certain of the medications C.W. takes, and without which she might well die, are known to cause congenital defects in a developing fetus. Moreover, C.W.'s epilepsy could cause a spontaneous abortion or premature birth. Even if C.W. carried the pregnancy to term, it might be inadvisable to allow her to experience labor and delivery, because of the time and medication involved. A caesarean section, which is a major operative procedure, would then have to be performed. Lastly, the testimony of Dr. Heller, a board certified psychiatrist, was to the effect that a pregnancy could be psychologically traumatic for C.W., particularly in the unlikely event that she could carry the pregnancy to term and would then have to be separated from the child due to her inability to care for it.

In contrast, the expert medical testimony revealed that performance of a tubal ligation would be a relatively nontraumatic event for C.W. C.W. would not comprehend the nature or effect of the procedure on her ability to procreate. Nor would her menstrual cycle or feelings of femininity be affected. Therefore, there would likely be no psychological damage or behavioral effect. Regarding the physical nature of the procedure, the experts agreed that it involves a very small incision and is customarily performed on an outpatient basis, following which the patient returns home and is back to normal within 72 hours. The small incision is made in the area of the navel and is regarded as a minor procedure. Because of C.W.'s other problems, her procedure would be done on an in-patient basis, but she would return home within

a day or two after the procedure. The mortality rate is one to three in 100,000 and is generally related to the anesthetic.[5]

In sum, the record is clear that the risks and trauma associated with a pregnancy far outweigh the risks and trauma associated with a tubal ligation.

Second, addressing factor 4, the record overwhelmingly demonstrates that C.W. is incapable of understanding reproduction or contraception and that this situation is likely to be permanent.

Third, addressing factor 7, the record also overwhelmingly demonstrates that C.W. is incapable of caring for a child and that this situation will not change. C.W.'s mental and physical disabilities render her substantially incapable of caring for herself, let alone another person.

Fourth, addressing factor 8, and despite appellant's argument to the contrary, there is no evidence in the record that scientific or medical advances in the future will make possible a relevant improvement in C.W.'s own condition or that any *relevant* developments in sterilization techniques are imminent. The trial court explored this question fully and correctly found that there is no medical evidence that a cure for epilepsy is on the horizon, or that C.W.'s brain damage can ever be repaired. Nor was there any suggestion by any expert that medical science is on the brink of developing a new contraceptive or sterilization technique that would have a materially different effect on a person in C.W.'s difficult mental and physical condition. Dr. Bolognese specifically testified that he was not aware of any such medical advances.[6]

**5.** We discuss more fully the precise nature of a tubal ligation in a later section of this opinion where we consider in detail all of the various medical contraceptive and sterilization options available to C.W.

**6.** The guardian ad litem makes much of the fact that during the pendency of this case hormonal contraceptives like Depo–Provera and Norplant have become generally available in this country. This, of course, is irrelevant to our consideration of this case, since there was testimony concerning these hormonal contraceptives at the hearings in this matter and that testimony, albeit scant, revealed that such treatments have not been widely enough employed for anyone to know what effect they might have on C.W.'s severe medical problems.

Lastly, addressing factor 9, the record strongly supports the trial court's conclusion that C.W.'s mother is acting in the interest of C.W. alone in seeking permission to have her sterilized. C.W.'s mother revealed only the greatest concern and affection for her daughter. She testified that her only desire was to improve the quality of her daughter's life and to protect her from any further pain. The trial court found the mother credible and found that she was not acting in her own interest.[7] We further emphasize that this is not a case where the spectre of eugenic sterilization, i.e. sterilization to prevent the birth of a "defective" child, is raised. Only C.W.'s own best interests are at issue.

We now proceed to consider the only two questions that are actually in dispute in this case in determining C.W.'s best interest. They are factor 3, the likelihood that C.W. will either voluntarily or involuntarily engage in sexual activity, and the overriding general requirement of *Terwilliger*, i.e., that the procedure proposed is the only practicable means of contraception. It is on these two factors that the guardian ad litem has based her opposition to the performance of a tubal ligation on C.W. Simply stated, the guardian has argued that C.W. is constantly monitored and is not now nor will she ever be at risk of pregnancy. Moreover, the guardian has argued that even if a risk of pregnancy is perceived, other contraceptive measures are preferable. The guardian has suggested the use of education and training or the birth control pill or other hormonal treatment.

The guardian ad litem has emphasized that in this Commonwealth, services to the mentally retarded are governed by the closely related principles of normalization and least restrictive alternative. As described by James McFalls, Director of Residential Services at Ken Crest, who testified at these proceedings on behalf of the guardian ad litem, normalization requires that the environment provided to mentally retarded persons be as close as possible to the environment in which

7. We further note that C.W.'s father, who is now divorced from her mother, executed an affidavit in which he concurred in the mother's petition.

they would function if they had no handicap. The least restrictive alternative concept means that services are not provided to persons at a level that is more intensive or restrictive than is necessary for that person to live a normal life. These principles seek to preserve the rights of the mentally retarded to live full and meaningful lives and to grow and develop to their fullest potential, without unnecessary intrusion.

We recognize that these principles have been sanctioned in Pennsylvania. *See In re Schmidt,* 494 Pa. 86, 429 A.2d 631 (1981); Mental Health Procedures Act, 50 P.S. 7101 (Purdon 1976). Also, the holding in *Terwilliger* is consistent with these principles since *Terwilliger* requires that sterilization be ordered only when it is the only practicable means of contraception, and further requires that the procedure chosen is the least physically intrusive method available. The question presented to us is how these principles are to be implemented in C.W.'s life, specifically in connection with the issues of contraception and sterilization, so as to serve her overall best interests.

Extensive testimony was presented regarding the likelihood that C.W. will engage in sexual activity. There are actually two questions posed in this regard. First, would C.W. engage in sexual activity voluntarily. Second, could sexual activity be imposed upon her. In one sense, any sexual intercourse with C.W. would be essentially nonconsensual, since it would appear that she is incompetent to give legally sufficient consent to sexual intercourse. Our reference to voluntary sexual activity is meant to refer to intercourse without force, that is, wherein C.W., for whatever reason, would not attempt to resist.

The record supports the trial court's finding that C.W. might be willing to engage in voluntary sexual intercourse. There is no evidence that her sexual development has not proceeded normally. Furthermore, the record reveals she has an excessively affectionate nature and desires physical closeness. The record is full of references to C.W.'s affectionate nature. More than one witness testified that C.W. appears to

crave physical contact with others, including strangers. During C.W.'s interview with the trial judge, she indiscriminately hugged the judge's female law clerk and a male court employee C.W. had never seen before. During C.W.'s examination by Dr. Knast, a psychologist who evaluated her, she exposed her stomach to him and attempted to tickle his. Dr. Bolognese, the court appointed gynecologist who examined C.W., found her to be almost coquettish in demeanor.[8] The opinion of Ms. Lewin, a psychologist who examined C.W. at the behest of the guardian ad litem, was aptly summarized by the trial court as follows:

> Ms. Lewin ... concluded that [C.W.] is not sexually active, has no awareness of sex, and her affectionate gestures are not indications of sexual interest.... Ms. Lewin noted that when she asked permission of [C.W.] to touch her crotch, [C.W.] signed "OK" and emphatically "Yes." Ms. Lewin expressed her concern about [C.W.]'s vulnerability to being victimized and noted that the staff believes that if [C.W.] was left alone, she would go with anyone who was nice to her....

> Ms. Lewin determined that [C.W.'s] sexual activity is limited to masturbation, that she understands the concept of masturbation and was able to demonstrate it. During a discussion of intercourse, [C.W.] gestured to Ms. Lewin that she engages in intercourse "all the time" and with every male she knows (her father, staff and CLA residents). She found that [C.W.] has an early adolescent awakening of feelings and fantasies, is keenly aware of her sexuality and femininity and uses both whenever possible, even where inappropriate. She engages in inappropriate touching, especially with strangers.

Trial Court Opinion, at 25–6.

The record also reveals that in mid–1989, when C.W. visited her primary physician, the physician's notes include a refer-

---

8. Interestingly, Dr. Bolognese's physical examination of C.W. also revealed that she does not have an intact hymen. This was a fact previously unknown to C.W.'s mother or, apparently, any other person involved in her care. The record does not reveal any reliable explanation for C.W.'s lack of an intact hymen.

ence to a comment by the caretaker who brought C.W. to the appointment. The notes indicate that the caretaker stated that there had been "increased kissing involvement" between C.W. and her "boyfriend". The record does not state who the boyfriend is or what C.W.'s precise relationship with him is.

Clearly, the picture of C.W. that emerges from this record is of a young woman who might voluntarily engage in sexual activity without comprehending the nature or possible impact of such activity. Moreover, the possibility of C.W. being victimized by sex forcibly being imposed on her is a true risk. The question therefore becomes: how likely is it, given the realities of C.W.'s living circumstances, that she actually *would,* either voluntarily or by force, engage in sexual activity?

In answering this question, we must examine the various approaches to preventing C.W. from becoming pregnant which the guardian ad litem has proposed. She concludes that supervision and education and training will be effective. We have carefully reviewed the record to determine whether these approaches are or will be so effective that they will reduce the likelihood of C.W. engaging in sexual activity to a level that merits no further contraceptive measures in order to protect C.W. from the disastrous eventuality of pregnancy.

C.W. is presently closely supervised. She lives in a community living arrangement with other mentally impaired persons and a staff of several people. She is not permitted to leave the CLA alone. Because of her seizure disorder, she is checked every 15 to 30 minutes during the day. It appears from the record that she is not equally well supervised at night. One staff member at the CLA testified that only one staff member is on duty at night and that she is not located on the floor where C.W.'s room is. Also, that staff member is permitted to and sometimes does sleep during the night. Immediately prior to the first hearing in this matter, a small intercom box similar to that often used by people with young babies was placed in C.W.'s room so that staff could monitor noises from C.W.'s room while in other areas of the CLA.

When C.W. left the CLA to attend high school or the skills center, she went by school bus. The record is not clear as to how well supervised she was at the high school and skills center, nor is it at all clear what level of supervision will be provided at the sheltered workshop.

The testimony revealed that the 15 to 30 minute supervision provided C.W. when she is at the CLA is deemed medically necessary and is more than is given to other residents. The trial court heard a great deal of testimony as to whether this level of supervision was adequate to safeguard C.W. from pregnancy. The court concluded it was not and we find substantial support in the record for the court's conclusion. The expert testimony was in conflict. Experts called by petitioner uniformly found this level of supervision inadequate, noting that much can be accomplished that can cause pregnancy in less than 15 minutes. Experts called by the guardian ad litem felt that the level of supervision was adequate, reducing the possibility of pregnancy to a very low level, although admittedly not eliminating it. Dr. Bolognese, called by the trial court, agreed with those who testified on behalf of the petitioner and was reluctant to conclude that supervision was sufficient to prevent C.W. from becoming pregnant.

The record does not support the guardian ad litem's conclusion that C.W. is "never alone". C.W. is sometimes alone. This record contains specific testimony regarding the fact that during the day C.W. is left alone in her room at her CLA for periods of 15 to 30 minutes and that in all likelihood at night she is left alone for considerably longer periods of time. C.W.'s mother testified that she initiated this proceeding because she was concerned that C.W. was not being supervised closely enough to protect her from the possibility of pregnancy. Her mother specifically related two incidents that gave rise to this concern. The first involved a situation where C.W. was on a picnic at Penn's Landing with others from her CLA and was permitted to go to the public ladies' room by herself. The second related to a time when C.W.'s mother was visiting the CLA and observed a young male resident of

C.W.'s CLA standing in C.W.'s bedroom door watching C.W. undress.

The record also contains specific evidence of what has happened to C.W. when she was left alone. On one occasion, C.W. was in her room at the CLA. The staff person on duty was in the basement. She came up and heard a noise on the monitor coming from C.W.'s room. She then noticed the light in C.W.'s hall was out and saw a male resident of the CLA running from C.W.'s room. She went into C.W.'s room and found C.W. on her bed with her nightgown pulled up. C.W. was visibly upset and signed to the staff member that the male resident had touched her, pointing to her breasts, waist and pubic area.[9]

In light of the above record evidence, we find the trial court was correct in rejecting the guardian ad litem's argument and in concluding that the level of supervision that has been given to C.W. up to now, which has been deemed medically sufficient by all those who care for her, may well be insufficient to protect her from sexual activity.[10] Thus, if supervision is to be relied upon as the sole contraceptive device to be provided to C.W., the level of supervision will have to increase. C.W. could not be permitted to be alone and she could not have any

9. The guardian ad litem makes much of the alleged fact, which is based not on record evidence but rather on the representation of the guardian, that C.W. no longer lives with any male residents at her CLA. We do not find it appropriate to accord nearly the degree of significance to that fact as does the guardian. The absence of men living at C.W.'s CLA does not shield her from the possibility of contact with a man. Clearly there does not need to be a male residing in C.W.'s CLA for a man to be present there. Nor does anyone deny that C.W. may well come into contact with men at the home of her mother and other relatives, where she frequently visits, at her sheltered workshop, and at the social gatherings she sometimes attends.

10. We reject the guardian ad litem's argument that the supervision level accorded to C.W. up to now has proven itself to be effective since there is no indication that C.W. has yet engaged in sexual activity. The fact is, no one knows whether she has engaged in sexual activity and, even if she has not, certainly no one knows whether she will in the future. *Terwilliger* does not require that we wait until there is actual proof of sexual activity before action is taken to protect the incompetent from it. *Terwilliger* requires that we assess, *inter alia,* the *likelihood* of sexual activity.

degree of personal freedom. In such an environment she could not develop with the same freedom that she otherwise might have. Clearly, such an approach is extremely restrictive and runs completely contrary to principles of normalization and least restrictive alternative.

The guardian ad litem also argues that education and training, coupled with the present level of supervision, is adequate to protect C.W. from becoming pregnant. The record reveals that C.W.'s capacity for absorbing education and training is severely limited. C.W. has twice received education and training in the areas of behavior management, appropriate social interaction and sexuality, including the basics of reproduction and the difference between male and female bodies. Several years ago, C.W. was given "good touch—bad touch" training to assist her in protecting herself against physical abuse. By the time the trial court interviewed C.W. in 1988, she had completely forgotten these lessons. As we have previously indicated, she continued not only to be willing to have physical contact with strangers, but actually to seek it. She had not learned the difference between appropriate and inappropriate social behavior and could not indicate the differences between male and female bodies.

In 1989, during the pendency of these proceedings, training of C.W. in these areas was reinitiated. C.W.'s behavior had deteriorated. She had become uncooperative and engaged in self-abusive behavior such as biting and scratching herself. A behavior modification program was instituted. A sexuality consultant visited the CLA and provided training to the residents of the CLA once a month. Staff at the CLA reinforced these lessons in between the consultant's visits. Specifically, C.W. was given a form of training called "Circles," in which she was taught the appropriate manner of behaving with people who stood in various relationships to her, from stranger to friend to relative. The testimony at the hearings in 1989 indicated that C.W.'s behavior had improved and that she was retaining some of the information concerning appropriate social behavior.

Several of the experts who testified on behalf of the guardian ad litem stated their belief that C.W. is capable of learning the difference between appropriate and inappropriate social behavior. They opined that such training will render her less vulnerable to attack and less likely to engage in voluntary sexual activity.

Other experts were less sanguine. Dr. Heller, a psychiatrist called by the petitioner, did not believe that training would be effective in materially increasing C.W.'s comprehension of appropriate social behavior because her learning abilities are substantially impaired by irreversible neurological damage. Dr. Knast, another psychiatrist who testified for petitioner, found that C.W. has difficulty in understanding the consequences of behavior. Although Dr. Knast did not rule out some improvement in C.W.'s behavior and understanding, he opined that it would take at least two to three years for her to develop the communication skills necessary for behavior modification.

We have carefully considered the evidence concerning the effectiveness of educating C.W. and we concur in the trial court's finding that education is not the answer. Even accepting that C.W.'s present training program has shown some results, it is simply a fact that no amount of training can protect C.W. from physical abuse. Moreover, from this record we cannot conclude with any degree of confidence that C.W., with her substantial neurological damage, can be educated not to engage in voluntary sexual activity, given her apparent natural desire to have physical contact with those around her. C.W., at the age of 20, could still only write her first name, could not be separated from her Kermit the Frog puppet, thought that babies could be purchased at the store and was willing to have physical contact with total strangers. The record reveals her ability to learn and retain information and to modify her behavior is very limited.

We also concur in the trial court's recognition of the fact that no court can guarantee that education programs will be significantly effective to increase C.W.'s ability to understand and deal with sexuality or that even if there were such

programs that they would be available to C.W. on an on-going basis. The record reveals that the programs C.W. has participated in have not markedly increased her capacity to learn and retain the information conveyed. She is now 24. She has lived in her CLA since she was 12 and, in all likelihood, she has been capable of reproduction for almost a decade. It is particularly telling that when the trial judge interviewed C.W., she was still completely incapable of comprehending anything about reproduction or sexuality or of controlling her own behavior.

Although the guardian ad litem opposed any medical means of contraception or sterilization, arguing that none of these options were at all necessary to eliminate the possibility of C.W. becoming pregnant, the guardian also argued that if a medical approach were deemed necessary, then methods short of tubal ligation were preferable. The medical options are: 1) barrier methods, such as an IUD or diaphragm; 2) hormonal treatments, such as Depo–Provera; 3) the birth control pill; and 4) tubal ligation.[11]

There was substantial agreement among the medical experts as to the relative advantages and disadvantages of each alternative.[12] In reviewing the testimony we have focused on the intrusiveness, risks and effectiveness of each alternative. In doing so, we have followed the dictates of *Terwilliger*. *Terwilliger* requires that we choose the least intrusive approach, but also requires that we find that the method chosen is the only *practicable* means of contraception for the incompetent. Thus, the *Terwilliger* standard recognizes that the effectiveness of the method chosen is a legitimate concern. Further, we have evaluated the trial court's conclusions regarding the medical risks posed to C.W. by each alternative.

11. The guardian ad litem also argued that abortion should be considered as a method of dealing with the eventuality of C.W. becoming pregnant. The guardian argued that a first trimester abortion would be only as physically intrusive as a tubal ligation. The trial court rejected this alternative, and we find no error in the court's reasoning.

12. All of these witnesses were called by either the petitioner or the trial court. The guardian ad litem did not call a doctor to contradict the medical testimony on this issue.

Barrier methods were not recommended by any witness. Most such methods would require C.W. to be responsible for her own contraception, which is clearly beyond her capability. Any such method is impracticable in C.W.'s case. The IUD, which is placed by a physician, presents a risk of infection or perforation and must be replaced every year. The risks posed by an IUD are too great, and the necessity of a medical procedure every year is too intrusive and may make it more intrusive than tubal ligation.

The sum and substance of the testimony of the experts regarding the hormonal treatments was that none of them have been widely enough used as contraceptive devices in this country for any expert to know what risks they might pose to C.W. given her substantial physical problems.

The third option is the birth control pill. The guardian ad litem has argued that if any medical contraception is deemed necessary, the pill should be given serious consideration. The guardian is correct that the pill is extremely effective, easily administered and requires no surgical procedure.

However, the guardian's argument in favor of the pill as a method of contraception *for C.W.* rests largely upon a letter from C.W.'s neurologist, Dr. Elliott A. Schulman, to the guardian. While Dr. Schulman was not called to testify, this letter was admitted into evidence. The letter apparently responds to an inquiry the guardian had put to Dr. Schulman, i.e., whether C.W. could receive general anesthesia in order to have a tubal ligation or whether she could be given the birth control pill. In the letter, Dr. Schulman states:

> Some patients have increased seizure frequency, others have decreased seizure frequency and some have no change while on birth control pills. This might be an option worth considering if you are hesitant putting her under general anesthesia.

The guardian ad litem considers this letter to be a statement by Dr. Schulman that the birth control pill is a "viable option" for C.W. Clearly, the guardian views Dr. Schulman as having endorsed the use of the birth control pill for C.W. The

trial court did not agree. We find the more plausible interpretation of Dr. Schulman's letter to be that he considered the pill an option despite its possible adverse effects on C.W.'s seizure problem if general anesthesia had to be ruled out because of its medical risks.

The experts who actually testified regarding giving the pill to C.W. unanimously opposed it. They cited the following possible difficulties:

1. The birth control pill is not administered to women over the age of 35 and, therefore, it is not even potentially a permanent contraceptive approach. Since it is not expected that C.W.'s condition will materially change, a potentially permanent solution is preferable.

2. The birth control pill can cause side effects in any woman. Some of these may indicate that more serious problems, like thromboembolic disease, are developing. If C.W. experiences such symptoms, she may not be capable of communicating that fact so as to enable the doctors to stop administering the pill or take other appropriate action.

3. Although the pill would be given to C.W. by her caretakers, if she refused to take her medications, as she has sometimes done in the past, the pill would be rendered totally ineffective.

4. The interaction of the pill with C.W.'s seizure medications is not known—use of the pill may require readjustment of those medications, which are already difficult to establish at levels sufficient to control C.W.'s seizures.

Giving due recognition to the fact that the pill is less physically intrusive than a tubal ligation, the trial court gave this option serious consideration but ultimately rejected it. The trial court's conclusion that use of the birth control pill would not be in C.W.'s best interests is supported in the record. The well-considered opinions of the medical experts reveal that the experts were concerned with the possible effect of introducing another strong medication into the existing array of medications C.W. already takes every day. C.W.'s seizure disorder is just barely manageable as it is. Her two

severe seizures in 1989 are stark evidence of that fact. The trial court concluded there was no reason to inject a new element that may further destabilize her, particularly where that element is unquestionably only a temporary solution to a problem that in all likelihood is permanent.

Next we assess the trial court's conclusion that tubal ligation is in C.W.'s best interest. The testimony of Dr. Seitz and Dr. Bolognese, both of whom are gynecologists and obstetricians with excellent qualifications and both of whom have performed hundreds of tubal ligations, described two types of tubal ligation, either of which could be performed on C.W.

Dr. Seitz recommended a mini-laparoscopy in which the fallopian tubes are cauterized in one section. The incision required is very small and post-operative discomfort is minimal. Most such procedures are done on an out-patient basis, although C.W. would have to be hospitalized to ensure that she is adequately medicated prior to surgery and to monitor her recovery thereafter. The risk of failure is one in 300 and the mortality rate is 3 in 100,000. There is no significant risk of complications. Most interestingly, the procedure is not permanent and, therefore, is not actually "sterilization" as that word has traditionally been understood. In eighty percent of the cases, this form of tubal ligation is reversible. The tubes are simply rejoined in a relatively minor surgical procedure.

Dr. Bolognese performs a different form of laparoscopic tubal ligation in which the fallopian tubes are cauterized at three locations. The recovery period and discomfort level is the same, and the failure rate is four in 1,000. Dr. Bolognese stated that if the procedure is done by an experienced practitioner, there is a minimal risk of complications. This procedure is not reversible, but neither does it interfere with a woman's ability to conceive through in vitro fertilization.

The trial court's conclusion that tubal ligation by laparoscopy is beyond any doubt the option that best serves C.W.'s medical and psychological interests is supported in the record. The procedure is not a dangerous operation and is not overly intrusive since it requires only a small incision into the area of

the navel. It is extremely effective in contraception and it does not totally preclude C.W. from conceiving a child in the future in the very unlikely event that she is ever desirous or capable of having and caring for a child.[13] C.W. will not experience any reduction in her feelings of femininity or in her menstrual cycle. No psychological damage or behavioral modification is expected to result from the procedure since C.W. cannot comprehend the nature or effect of it on her ability to reproduce.

In determining the best interests of C.W., the trial court's decision in favor of allowing a tubal ligation does not demonstrate an error of law or abuse of discretion. We have carefully examined the trial court's findings and reasoning and are confident that all the information that is pertinent to the decision was before the trial court. In the end, the evidence demonstrates that despite the best efforts of all concerned to guard and educate C.W., the possibility of sexual activity and pregnancy does exist. That evidence also shows that no one can assess with precision how likely that eventuality is. The record is replete with the adverse impact of a pregnancy on C.W., and that pregnancy would be completely negative and perhaps even disastrous. Therefore, the trial judge was correct that C.W.'s best interests require that she be protected against that eventuality. Anything short of tubal ligation requires experimenting with various contraceptive medications that may cause her to experience more seizures, more pain and discomfort. When the alternative medical procedures are weighed against tubal ligation, a relatively simple and extremely effective procedure, the latter emerges as the best option.

13. Unlike the situation that appears to have been presented to the *Terwilliger* court, where the tubal ligation procedure proposed was irreversible and no alternative means of conception was possible for Ms. Terwilliger, we are not here presented with such a limited field of choices. The ten years since *Terwilliger* have seen the development of a highly reversible form of tubal ligation. In addition, even in the case of an irreversible tubal ligation, conception is not out of the question. Medical science has developed the in vitro fertilization procedure and is constantly perfecting new methods of enabling women to conceive despite severe damage to their fallopian tubes.

The best interests of C.W. require that a guardian with authority to consent to tubal ligation be appointed.

The order of the trial court is affirmed.

McEWEN, J., concurs in the result.

JOHNSON, J., files a dissenting opinion.

DEL SOLE, J., joins the dissenting opinion by JOHNSON, J.

HUDOCK, J., files a dissenting statement.

JOHNSON, Judge, dissenting.

In this appeal, we are asked to determine whether the proponents of sterilization have proven that sterilization is the only practicable means of contraception for C.W., a young woman with moderate to severe mental retardation, epilepsy and cerebral palsy. The majority wants us to infer that any attempt to administer the birth control pill or other hormonal methods of contraception to C.W. would have disastrous effects on her already tenuous physical condition. Clearly, the medical experts were concerned with the *possible effect* of introducing another medication into the existing array of medications C.W. already takes. Nonetheless, the effect of the interaction of the pill with C.W.'s seizure medications *is not known*. The proponents of sterilization have not satisfied their burden of proving by clear and convincing evidence that less drastic contraceptive methods such as birth control pills and hormonal treatments are unworkable. Accordingly, I must respectfully dissent.

The majority, in concluding that sterilization is in C.W.'s best interests, determines that the trial court's decision does not demonstrate an error of law or abuse of discretion. *See* Majority Op. at 192. In so doing, my colleagues have abandoned the proper scope of appellate review. We have the broadest scope of review in cases such as this because of the permanent nature of a sterilization procedure. *In the Matter of Mildred J. Terwilliger*, 304 Pa.Super. 553, 450 A.2d 1376 (1982). I am dismayed that my colleagues have declined to

exercise the full extent of our appellate powers in the discharge of our heavy responsibility in this case.

All parties to this action agree that C.W. may be capable of becoming pregnant and that full-term pregnancy would not be in C.W.'s medical or psychological best interests. It is undisputed that C.W. is incompetent to make a decision regarding sterilization. It also remains uncontested that C.W.'s mother had only the best of intentions in seeking the tubal ligation on behalf of her daughter. However, I cannot agree with the trial court's conclusion that the best interests of C.W. require that a guardian with authority to consent to tubal ligation be appointed.

The parties to this action were, at all times, operating in good faith in this attempt to discern what is in the best interests of C.W. The most distinguished trial judge, the Honorable Judith J. Jamison, is to be commended on the thorough deliberation given to this important issue, as is evidenced by the extensive record and the painstaking consideration of the facts of this case contained in the trial court opinion. However, C.W.'s best interests do not automatically result from the process of careful consideration. While the majority places some emphasis on the *process*, I am mindful that mistakes involving another's reproductive rights have been justified throughout history on the basis that a decision was only reached after careful consideration of all the issues and facts involved.

In our determination of this appeal, we are bound by the standard enunciated in *Terwilliger, supra.* In deciding whether to authorize sterilization, we may only consider the best interests of the incompetent and we are not permitted to consider whether sterilization serves the interests or convenience of that individual's parents, guardian, or of society. *Id.* at 564, 450 A.2d at 1382. The proponent of sterilization must prove that sterilization is in the incompetent's best interests by clear and convincing evidence. *Id.* at 564, 450 A.2d at 1383.

The *Terwilliger* court articulated three minimum requirements with which the trial court must comply before authoriz-

ing sterilization. First, the trial court should appoint a *guardian ad litem* and insure that appropriate medical, psychological and social evaluations are made of the incompetent person, with evidence of these evaluations to be preserved in the record. *Id.* at 565, 450 A.2d at 1383. Second, the trial court must find that the individual lacks the capacity to make a decision about sterilization and that the incapacity is unlikely to change in the future. *Id.* Third, the proponent of sterilization must prove that the person for whom sterilization is sought is capable of reproduction, and *that sterilization is the only practicable means of contraception, i.e., all less drastic contraceptive methods, including supervision, education and training are unworkable. Id.* Detailed testimony must show, to a reasonable degree of medical certainty, that the sterilization procedure requested is the *least intrusive means* necessary to protect the interests of the individual. *Id.*

I find that the majority does not adequately address C.W.'s constitutional right of privacy, including the rights to bodily integrity and reproductive autonomy. Moreover, the record does not support the conclusion that all less drastic means of contraception are unworkable.

The Supreme Court of the United States has recognized a fundamental constitutional right to privacy, which encompasses an individual's right to make autonomous decisions regarding reproduction. *See, e.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Eisenstadt v. Baird,* 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972); *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The Supreme Court has also held that an individual's fundamental right to privacy cannot be diminished due to that person's incompetence. *Cruzan v. Missouri Department of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Since a fundamental right is implicated in the decision to impose sterilization upon an individual, the state must demonstrate a compelling state interest before it may constitutionally deprive an individual of that right. *See, e.g., Eisenstadt v. Baird,* 405 U.S. at 448, 92 S.Ct. at 1035, 31 L.Ed.2d at 359. If a less restrictive alternative is available that can achieve the

same stated goal without depriving an individual of a fundamental right, it must be utilized. *Shelton v. Tucker,* 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); *In re Schmidt,* 494 Pa. 86, 429 A.2d 631 (1981); *Terwilliger, supra.* The Majority fails to consider these constitutional issues.

Based on these sound constitutional principles, and the long history of eugenic sterilization of the mentally retarded in the United States, (*see Buck v. Bell,* 274 U.S. 200, 47 S.Ct. 584, 71 L.Ed. 1000 (1927)), courts in other jurisdictions, as well as our own, have held that sterilization of mentally retarded individuals implicates a fundamental right and requires that we impose the least restrictive alternative in seeking contraceptive measures for those individuals. *See, e.g., In the Matter of the Welfare of Hillstrom,* 363 N.W.2d 871 (Minn.Ct.App.1985); *Conservatorship of Valerie N.,* 40 Cal.3d 143, 219 Cal.Rptr. 387, 707 P.2d 760 (1985); *Wentzel v. Montgomery General Hospital,* 293 Md. 685, 447 A.2d 1244 (1982), *cert. denied,* 459 U.S. 1147, 103 S.Ct. 790, 74 L.Ed.2d 995 (1983); *Terwilliger, supra.*

It is with these constitutional principles in mind that the trial court's decision to appoint a guardian with authority to consent to tubal ligation should be reviewed. The trial court, while stating that it was adhering to the principles set forth in *Terwilliger,* actually rejects the fact that C.W.'s fundamental rights are at stake in this proceeding. In addressing this issue, the trial court stated, citing the opinion of Lord Hallsham in the English case of *Re B,* 2 All ER, 2 WLR 1213, FLR 314 (1987):

> To talk of the 'basic right' to reproduce of an individual who is not capable of knowing the causal connection between intercourse and childbirth, nature of pregnancy, what is involved in delivery, unable to form maternal instincts or to care for a child appears to me wholly to part company with reality.

Trial Court Opinion, February 28, 1990, at 56.

The trial court also spoke to the issue of the loss of a fundamental right in a case such as C.W.'s:

The basic right to reproduce is meaningful only when such procreation is the result of informed choice. Certain retarded and mentally impaired individuals may be capable of making such a choice and their right to choose must be safeguarded. Because of organic brain damage and retardation, [C.W.] is incapable of making such a choice. Thus, the loss of choice is the loss of an illusory right only.

*Id.* at 57–8.

The rationale of the trial court on the issue of C.W.'s fundamental right to privacy and bodily integrity is simple sophistry. This Court must adhere to the sound constitutional principle that these fundamental rights inure to *all* citizens and may be invaded *only* when there are no alternate means to protect the best interests of an individual.

Tubal ligation has not been established as the least restrictive nor as the only practicable means of contraception available to C.W. Therefore, I conclude that the trial court's Order violates C.W.'s fundamental rights to privacy and bodily integrity and should be reversed.

The majority does not faithfully apply these constitutional principles to the facts of this case. The majority acknowledges the constitutional dimension of this case, stating that the *Terwilliger* court recognized that a decision to sterilize an incompetent impinges on that person's fundamental right to procreate and involves an invasion of that person's bodily integrity. *See* Majority Op. at 170. However, the majority's constitutional analysis ends with that acknowledgment. My colleagues abandon constitutional principles while failing to consider the effect of their decision upon C.W.'s fundamental rights.

Next, the majority concludes that sterilization is in C.W.'s best interests. They seemingly recognize that this determination ultimately depends upon a finding that sterilization is the only practicable means of contraception, i.e., all less drastic contraceptive methods are unworkable and sterilization is the least significant intrusion necessary to protect C.W.'s interests. *See* Majority Op. at 171, 180, 181, 189. However, I

cannot agree that sterilization is in C.W.'s best interests because the record does not support a finding that sterilization is the only practicable means of contraception.

C.W. was a twenty year old woman at the time that this action was initiated. She suffers from organic brain damage. Experts who have evaluated C.W. agree that she has the mental age of a three to five year old child with an I.Q. of between 30–50. From the time she was twelve years old, C.W. has lived in a community living arrangement (a highly supervised group residence) but she spends every other weekend and holidays visiting her mother at home. C.W. is active and communicates with her caretakers through the use of signing and other oral non-language communication.

C.W. is also epileptic. Although she receives high daily doses of three different anti-seizure medications, Phenobarbital, Dilantin, and Tegretol, C.W.'s epilepsy is not well-controlled and leaves her subject to intermittent seizure activity. C.W.'s caretakers monitor and administer all of C.W.'s medication. These same caretakers also check C.W. every 15 minutes during the day to insure her safety. At night, C.W. is checked less frequently but her room is equipped with a monitor by which the caretaker can be made aware of any sounds in C.W.'s room.

At trial, and again on appeal, the *guardian ad litem* contends that the record does not support the trial court's conclusion that laparoscopic tubal ligation is the least restrictive and the least intrusive alternative means of contraception for C.W. The *guardian ad litem* also maintains that C.W.'s mother has not proved by clear and convincing evidence that all other less intrusive methods of contraception are unworkable. I agree with these two contentions.

Most of the testimony in this case concentrated on the devastating effects that a full-term pregnancy could have on C.W. and compared the risks of pregnancy to the risks of a tubal ligation. The experts who testified agreed that pregnancy would be potentially harmful for C.W. and that the statistical risk associated with sterilization is always less than preg-

nancy. This comparison, however, is both inappropriate and misleading for the resolution of the only issue before us. Once it has been determined, under *Terwilliger*, that C.W. is capable of becoming pregnant, that pregnancy is not in C.W.'s best medical and psychological interests, and that C.W. is incompetent to make choices about childbirth or contraception, the question then becomes: *what is the least intrusive or restrictive method of contraception that can be used to prevent pregnancy?*

The trial court rejected the birth control pill and other hormonal methods of contraception, concluding that they would not be in C.W.'s best interests. Hormonal medications such as birth control pills, Depo–Provera, and Delalutin were considered and rejected by the experts. However, these methods of contraception have not been proven to be unworkable by clear and convincing evidence, as is required under *Terwilliger*. On that basis, the *guardian ad litem* contests the trial court's rejection of hormonal methods of contraception. This contention is well-founded.

The experts put forth several reasons to support their conclusions that hormonal methods of contraception would not be in C.W.'s best interests. First, the experts indicated that since C.W.'s condition will not change over time, a permanent form of contraception should be employed in this case. The experts did not dispute the efficacy of hormonal methods of treatment nor did they dispute the fact that the use of hormonal treatments would be less intrusive than the tubal ligation that the trial court ultimately authorized. The experts rely on the temporary nature of hormonal methods to reject them without a trial or any proof that they are in fact unworkable options for C.W.

The trial court also relied upon the permanent nature of tubal ligation to reject other less intrusive forms of contraception, stating: "[t]o ask that the Court review what, if any, form of contraception is appropriate, every year or two is to deny any remedy, as the process is extremely burdensome." Trial Court Opinion, *supra*, at 47. By rejecting trials of other methods of birth control based on the burdens which would be

placed on the court, C.W.'s family, and her caretakers, the trial court specifically disregards the mandates of *Terwilliger*. *Id.* A decision to reject less intrusive methods of contraception, and to impose sterilization upon an individual based upon these factors alone is specifically prohibited by *Terwilliger*. *Terwilliger* 304 Pa.Super. at 564, 450 A.2d at 1382.

I cannot accept the trial court's rationale that sterilization, because it is permanent, is in C.W.'s best interests. Under the eighth *Terwilliger* guideline, the trial court was required to assess the possibility of scientific advances in the area of contraception and sterilization prior to authorizing sterilization. *Id.* at 567, 450 A.2d at 1384. C.W. was twenty years of age at the time of the hearing, and all experts agreed that the use of hormonal medications should cease once C.W. is thirty-five. However, no expert was willing to rule out the possibility that new or safer methods of contraception might be available when, in 15 years, C.W. would reach the age at which hormonal methods of contraception should be discontinued, based upon present medical knowledge. While C.W.'s contraceptive needs may be permanent, there is no evidence in the record that would support a finding that less intrusive methods of contraception will not serve her needs for the fifteen years immediately following the hearing. Sterilization now is not in C.W.'s best interests.

As a second rationale for rejecting hormonal methods of contraception, the experts also relied on the fact that birth control pills must be taken on a daily basis to be effective and that C.W. lacks the capacity to monitor the intake of her medications. All of C.W.'s medication is administered to her by her caretakers. However, there was some concern regarding the possibility that C.W. might at some time in the future refuse to take her medication. Speculation about C.W.'s future behavior constitutes no rationale for imposing sterilization upon her, given the lack of any empirical data or other information concerning C.W.'s response to taking an additional medication as part of her daily routine.

Third, the experts also expressed concern that since birth control pills, in particular, may cause side effects in some

women, they should not be administered to C.W. because she may be unable to accurately communicate her symptoms to her caretakers. The record is clear, nevertheless, that while side effects are possible with the administration of birth control pills, they do not occur in most women and can be detected by regular and conscientious medical care. *See, e.g.,* N.T., August 17, 1989, at 75–6.

An earlier Orphans' Court case, *In re Rubis,* 4 Fiduciary 2d 412 (Phila.Comm.Pleas 1984) addressed this issue in the only published Pennsylvania opinion to impose the *Terwilliger* standard. In that case, the parents sought permission from the court to sterilize their daughter, Diane, who was a twenty year old incompetent woman functioning at the level of a nine month old infant. The court, under the *Terwilliger* guidelines, rejected the petition for sterilization where less intrusive methods of contraception were potentially available, despite the fact that Diane was unable to communicate her symptoms to her parents in any way, and despite her parents' fears about potential side effects from the use of hormonal contraceptive agents. *Id.*

On the record before us, I am unable to conclude that the mere chance that side effects might develop constitutes a sufficient basis for rejecting a less intrusive method of contraception for C.W. in favor of sterilization. While C.W. is unable to use language, she is able to communicate her needs, wants and discomforts to her caretakers. The expert testimony also reveals that while the risk of side effects of birth control pills or other hormonal contraceptives may be present for C.W., as it is for any woman, frequent medical evaluations would allow C.W.'s physicians to detect any possible side effects from the use of these medications.

The fourth rationale advanced for the rejection of hormonal contraceptive methods is that there is a possibility of an adverse interaction between C.W.'s seizure medications and birth control pills or other hormonal medications. The record establishes that the experts *did not know* what the interaction would be between C.W.'s seizure medications and any of the hormonal methods of contraception. Dr. Bolognese testified

that he was "not aware of any good consistent report that implies or confirms that [C.W.'s] seizure disorder would be worsened by the use of birth control pills." N.T., August 17, 1989, at 75. While expert testimony indicated that a neurologist would be most qualified to speak to the issue of the possible interaction of hormonal contraceptive medications and C.W.'s seizure medications, the testimony of C.W.'s neurologist was not offered at the hearing before the trial court. However, a letter from the neurologist, Dr. Elliott Schulman, was introduced into evidence as exhibit G–11. N.T., June 6, 1988, at 656–7. This letter only indicated that birth control pills might be an option for C.W., but the combined effect of her seizure medications and birth control pills was *unknown. Id.* The letter did not mention other hormonal contraceptive methods. *Id.*

Based on my review of this record, I must conclude that the proponents of sterilization have not satisfied their burden of proof. They have failed to produce detailed medical testimony showing that, to a reasonable degree of medical certainty, the sterilization procedure requested is the least intrusive means necessary to protect C.W.'s interests as is required under *Terwilliger.* While maintaining that tubal ligation was in C.W.'s best interests, the court appointed expert, Dr. Bolognese, testified: "[c]ertainly it is not the least invasive. I think there are other methods that we have discussed that certainly are not invasive." N.T., August 17, 1989, at 87. Moreover, none of the experts testified that they believed "to a reasonable degree of medical certainty" that birth control pills or hormonal treatments are unworkable for C.W.

The most compelling evidence refuting the medical necessity of sterilization, based on C.W.'s epilepsy and use of seizure medications, was agreed to by all of the testifying physicians. Each stated that they would *not recommend* tubal ligation for a person of "normal" intelligence with C.W.'s medical problems and would attempt to *discourage* such a person from pursuing such an option. Both gynecologists, Drs. Bolognese and Seitz, testified that they would not personally perform a tubal ligation on a "normal" woman of C.W.'s age, even if her

medical problems were identical to C.W.'s. How then can we escape the obvious conclusion that the bodily invasion threatened here is being condoned not because it is the least intrusive means necessary, but because this is "good enough" for one with C.W.'s abnormalities?

Under *Terwilliger,* we are not permitted to engage in a balancing test between the available contraceptive measures and sterilization to decide which best suits the perceived needs of a particular patient and her family. Rather, *Terwilliger* prohibits this Court from affirming the trial court's grant of a petition for sterilization of an incompetent individual unless *all less drastic contraceptive methods are unworkable and* expert medical testimony has shown that *the sterilization procedure requested is the least significant intrusion necessary to protect the interests of the individual. Terwilliger* 304 Pa.Super. at 566, 450 A.2d at 1383. On the record before us, one cannot reasonably conclude that the intrusion of a tubal ligation is minimal or that it provides the least restrictive alternative for C.W.

Absent clear and convincing evidence that all other methods of contraception are unworkable for C.W., this Court cannot uphold the trial court's authorization of C.W.'s sterilization.

Accordingly, I dissent. I would reverse the decree of the trial court and remand for proceedings to insure that sterilization is not authorized before other practicable means of contraception are carefully considered, tried, and rejected under existing Pennsylvania law as the *Terwilliger* guidelines provide.

DEL SOLE, J., joins.

HUDOCK, Judge, dissenting.

While I agree with much of the Dissenting Opinion of my learned colleague, Judge Johnson, I write separately in dissent because I agree with *amici curiae* and the dissenting judge on the *en banc* panel of the court below, Judge Bruno, that sterilization should not be considered where there is no evidence of voluntary sexual activity. There is no such evi-

dence here. Further, I would modify the third guideline of *Terwilliger* to eliminate all consideration of the likelihood that the incompetent who is not engaging in voluntary sexual activity might do so in the future and would further eliminate the likelihood that she might be sexually abused as a consideration. I agree with *amici curiae* that such sterilization as a means of protection can only encourage complacency in safeguarding individuals like C.W. who need constant care and protection, and with Judge Bruno, who wisely wrote:

> The protection of this woman's physical person from harm is the real issue in this case. Sterilization will not and cannot protect [C.W.] from untoward sexual advances and abuse. It can only prevent one of the unwanted results of sexual abuse and activity, pregnancy. What about the trauma of rape? What about the death sentence of AIDS and the horrors of syphilis?

*Estate of C.W.*, O.C., No. 3107 of 1987, Slip Opinion at 2 (C.C.P.Phil., August 1, 1991) (Bruno, J., Dissenting).